[S.F. No. 23769. Apr. 30, 1979.]

WARREN RANKINS, as Superintendent-Principal, etc., et al.,
Plaintiffs and Respondents, v.
COMMISSION ON PROFESSIONAL COMPETENCE
OF THE DUCOR UNION SCHOOL DISTRICT et al.,
Defendants and Appellants;
THOMAS EDWARD BYARS, Real Party in Interest and Appellant.

COUNSEL

Evelle J. Younger, Attorney General, and William J. Power, Deputy Attorney General, for Defendants and Appellants.

Chain, Younger, Jameson, Lemucchi, Busacca & Williams, Paul G. Busacca and Leonard Sacks for Real Party in Interest and Appellant.

Calvin E. Baldwin, County Counsel, and Thomas D. Bowman, Assistant County Counsel, for Plaintiffs and Respondents.

OPINION

NEWMAN, J.—We inquire in this case whether as a condition of employment a school district may require a teacher to forego adherence to bona fide religious tenets that require several absences a year for observance of a church's holy days. We have concluded that under the circumstances presented such a condition of employment violates article I, section 8, of the California Constitution, which provides: "A person may not be disqualified from entering or pursuing a business, profession, vocation, or employment because of sex, race, *creed,* color, or national or ethnic origin." (Italics added.)

Thomas Byars was hired by Ducor Union School District in 1969 as an elementary classroom teacher under a contract requiring him "to render service . . . for such length of time during the school year as the Governing Board of the School District may direct." In 1971 he joined the Worldwide Church of God, which requires its members to refrain from all work on its weekly Sabbath (sundown Friday to sundown Saturday) and on certain holy days. To accommodate for those observances the district excused Byars from all Friday evening and Saturday activities and permitted him to be absent on two holy days in 1971-1972 and again in 1972-1973. His requests for permission to be absent on other holy days, always submitted well in advance, were denied. Accordingly he was absent without permission for eight days in 1971-1972, five in 1972-1973, eight in 1973-1974, and ten in 1974-1975. Most of those days were consecutive. On each day of absence his class was taught by a substitute teacher for whom he had prepared a detailed lesson plan. The same substitute was employed for most absences in each school year.

Byars' religious sincerity and his competence as a teacher are unquestioned. The compensation of substitutes apparently was deducted from his salary (Ed. Code, former § 13467, now § 44977).

In March 1973 the district sent him a letter of reprimand, stating its disapproval of the unexcused absences and warning that their continuation would justify his dismissal. By the same letter, however, the district rehired him for 1973-1974 and made him a permanent instead of a probationary employee.

In May 1975 the district notified him of its intent to dismiss him for "[p]ersistent violation of or refusal to obey the school laws of the state or reasonable regulations prescribed for the government of the public schools" (Ed. Code, former § 13403, subd. (g), now § 44932, subd. (g)), basing its charges solely on the absences. At his request a hearing was held on July 24, 1975, before a commission on professional competence (Ed. Code, former § 13413, subd. (b), now § 44944, subd. (b); see *Pasadena Unified Sch. Dist.* v. *Commission on Professional Competence* (1977) 20 Cal.3d 309, 311, fn. 1 [142 Cal.Rptr. 439, 572 P.2d 53]).

The district superintendent testified that a substitute cannot equal a good regular teacher because the substitute takes time to become acquainted with the pupils' abilities and discipline problems, and may not be able to execute the lesson plan properly or acquire enough information to provide continuity of instruction. There was no other evidence of detriment caused by Byars' absences.[1] He introduced evidence that members of his church employed as teachers by five nearby school districts in Kern County were allowed to observe the holy days without hindrance or threat of discharge.

The commission found that none of his absences had a substantially detrimental effect on the educational program and that the district's denial of his requests for permission to be absent, together with its threats of discharge for such absences, interfered with his free exercise of religion. The commission concluded that this interference violated the Fourteenth Amendment of the United States Constitution and article I, section 4, of the California Constitution[2] and, therefore, that he had not failed to obey a valid school law or regulation.

---

[1]Byars' objection was sustained to questions about the superintendent's observations of Byars' classes while substitutes were in charge. The presiding officer indicated apprehension that admission of the testimony would open up collateral issues of the substitutes' competence and unduly prolong the hearing. (See Evid. Code, § 352.)

[2]Article I, section 4, states in part: "Free exercise and enjoyment of religion without discrimination or preference are guaranteed. This liberty of conscience does not excuse. acts that are licentious or inconsistent with the peace or safety of the State. The Legislature shall make no law respecting an establishment of religion."

The district, its superintendent, and its board then brought the present mandate proceeding attacking the commission's order. (Ed. Code, former § 13414, now § 44945.) The trial court ruled that discharge of Byars was proper on the record before the commission.[3] The court found that his replacement by substitute teachers during his absences had a "substantial detrimental effect" that justified the district's discharging him notwithstanding the constitutional provisions cited by the commission. Accordingly the court ordered issuance of a writ of mandate; Byars appeals.

 Would Byars' dismissal for absences required by his religious faith cause him to be "disqualified from . . . pursuing . . . [an] employment because of . . . creed" in violation of article I, section 8 of the California Constitution? The stated reason for dismissal was not his religion but his nonattendance at school in accordance with district rules. Section 8, however, forbids not only overt religious discrimination but also qualifications for employment that are discriminatory in effect. (See *Wisconsin* v. *Yoder* (1972) 406 U.S. 205, 220 [32 L.Ed.2d 15, 27-28, 92 S.Ct. 1526]; *Griggs* v. *Duke Power Co.* (1971) 401 U.S. 424, 431 [28 L.Ed.2d 158, 164, 91 S.Ct. 849].) Though the district's rules are religiously neutral on their face, their effect was to exclude Byars from his employment because of his adherence to the precepts of his church. (See *Sherbert* v. *Verner* (1963) 374 U.S. 398, 403-404 [10 L.Ed.2d 965, 969-971, 83 S.Ct. 1790].) Unless that adherence created "an inability to perform the tasks required by a particular occupation," reliance on it for dismissal amounted to disqualification because of religion. (See *Sail'er Inn* v. *Kirby* (1971) 5 Cal.3d 1, 9 [95 Cal.Rptr. 329, 485 P.2d 529, 46 A.L.R.3d 351].)[4]

No published court opinion seems to have construed article I, section 8's prohibition of religious discrimination. Lines between (1) religiously proscribed tasks that the employment may lawfully require, and (2) tasks whose requirements by the employer would constitute unlawful religious

---

[3]The court refused the district's request to present testimony that the commission had excluded concerning the substitute teachers' performance in Byars classroom (see fn. 1 *ante*).

At the administrative hearing the commission had also refused to receive proof of two of Byars' unexcused absences in 1973-1974 and two in 1974-1975. The court ruled that those absences should be considered even though they had been omitted from the notice of charges originally served on Byars.

[4]*Sail'er Inn* construed former article XX, section 18, which prohibited disqualification from employment because of sex in language that was broadened in article I, section 8, adopted in 1974, to include prohibition of other forms of discrimination. Former article XX, section 18, was in the original Constitution of 1879 (see *Matter of Maguire* (1881) 57 Cal. 604) and was reworded without substantial change in 1970 (*Sail'er Inn*, 5 Cal.3d at p. 8, fn. 5).

discrimination have most frequently been drawn under the federal Civil Rights Act of 1964. Section 703(a)(1) of the act makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin" (42 U.S.C. § 2000e-2(a)(1)).[5] To implement that section the Equal Employment Opportunities Commission in 1967 issued guidelines declaring that the duty not to discriminate on religious grounds includes an obligation to make reasonable accommodation to employees' religious needs insofar as possible without undue hardship on the employer's business. (29 C.F.R. § 1605.1.)[6]

The guidelines were incorporated into a 1972 amendment of the act (42 U.S.C. § 2000e(j)),[7] and five years later the Supreme Court upheld them as a "defensible construction of the pre-1972 statute" (*Trans World Airlines, Inc.* v. *Hardison* (1977) 432 U.S. 63, 76, fn. 11 [53 L.Ed.2d 113, 126, 97 S.Ct. 2264]). Earlier decisions in three federal circuits approved

[5]Direct applicability of the Civil Rights Act to this case need not be considered as Byars is not pursuing the act's remedies. (*United Air Lines, Inc.* v. *Evans* (1977) 431 U.S. 553, 558 [52 L.Ed.2d 571, 578-579, 97 S.Ct. 1885].) The act does not interfere with enforcement of state antidiscrimination laws. (42 U.S.C. §§ 2000e-7, 2000h-4.)

[6]The guidelines, still in effect, state:

"(a) Several complaints filed with the Commission have raised the question whether it is discrimination on account of religion to discharge or refuse to hire employees who regularly observe Friday evening and Saturday, or some other day of the week, as the Sabbath or who observe certain special religious holidays during the year and, as a consequence, do not work on such days.

"(b) The Commission believes that the duty not to discriminate on religious grounds, required by section 703(a)(1) of the Civil Rights Act of 1964, includes an obligation on the part of the employer to make reasonable accommodations to the religious needs of employees and prospective employees where such accommodations can be made without undue hardship on the conduct of the employer's business. Such undue hardship, for example, may exist where the employee's needed work cannot be performed by another employee of substantially similar qualifications during the period of absence of the Sabbath observer.

"(c) Because of the particularly sensitive nature of discharging or refusing to hire an employee or applicant on account of his religious beliefs, the employer has the burden of proving that an undue hardship renders the required accommodations to the religious needs of the employee unreasonable.

"(d) The Commission will review each case on an individual basis in an effort to seek an equitable application of these guidelines to the variety of situations which arise due to the varied religious practices of the American people."

[7]The amendment defines "religion" as including "all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business." (42 U.S.C. § 2000e(j).)

the guidelines' requirement of reasonable accommodation without undue hardship as a proper application of the principle (declared in *Griggs* v. *Duke Power Co., supra,* 401 U.S. 424, 431 [28 L.Ed.2d 158, 164]) that discrimination may be established by showing the disproportionate impact of an employment practice not justified by "business necessity."[8] (*Yott* v. *North American Rockwell Corporation* (9th Cir. 1974) 501 F.2d 398, 402-403; *Riley* v. *Bendix Corporation* (5th Cir. 1972) 464 F.2d 1113, 1115-1117; *Draper* v. *United States Pipe & Foundry Co.* (6th Cir. 1975) 527 F.2d 515, 517, fn. 1; *Reid* v. *Memphis Publishing Company* (6th Cir. 1972) 468 F.2d 346, 350; but see contrary Sixth Circuit cases: *Dewey* v. *Reynolds Metal Company* (6th Cir. 1970) 429 F.2d 324, 329-330, affd. by equally divided court, 402 U.S. 689 [29 L.Ed.2d 267, 91 S.Ct. 2186]; *Reid* v. *Memphis Publishing Company* (6th Cir. 1975) 521 F.2d 512, 519, hg. en banc den., 525 F.2d 986.)

Relying on those decisions the Alaska Supreme Court recently construed its state statute forbidding religious discrimination as implying a similar duty of reasonable accommodation. (*Wondzell* v. *Alaska Wood Products, Inc.* (Alaska 1978) 583 P.2d 860, 864; cf. *Olin* v. *Fair Employment Practices Com.* (1977) 67 Ill.2d 466, 474-475 [367 N.E.2d 1267, 1270-1271] (leaving question open under Illinois statute).) We think that duty also is implied by California's constitutional prohibition of religious disqualification from employment (art. I, § 8). Californians adopted the prohibition in 1974, and it expresses the same deep concern for religious freedom that underlies the First Amendment (see, e.g., *Wisconsin* v. *Yoder, supra,* 406 U.S. 205, 220-221 [32 L.Ed.2d 15, 27-29]). Just as that historic amendment protects religious practices from interference in the absence of a compelling state interest (*People* v. *Woody* (1964) 61 Cal.2d 716 [40 Cal.Rptr. 69, 394 P.2d 813]), article I, section 8 forbids disqualification of employees for religious practices unless reasonable accommodation by the employer is impossible without undue hardship.

The record here shows that by seeking to dismiss Byars the district failed to make reasonable accommodation to his desire to observe his church's holy days. The district's contention that its efforts to accommodate were as extensive as those found sufficient in *Trans World Airlines, Inc.* v. *Hardison, supra,* 432 U.S. 63 does not stand scrutiny. Hardison, an aircraft maintenance stores clerk who did work that had to be performed at all hours of every day, also joined the Worldwide Church of God to

---

[8]"The [Civil Rights] Act [of 1964] proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation. The touchstone is business necessity. If an employment practice which operates to exclude Negroes cannot be shown to be related to job performance, the practice is prohibited." (*Griggs,* 401 U.S. at p. 431 [28 L.Ed.2d at p. 164].)

which Byars belongs. The employer accommodated Hardison's observance of holy days but found (1) that no qualified employee was willing to fill Hardison's job on his Saturday Sabbath, and (2) that involuntary assignment of a replacement was forbidden by the seniority provisions of the collective bargaining contract. The court held that the employer's duty of reasonable accommodation did not require it to violate the contract, to pay overtime wages to a substitute, or to get along with one less Saturday employee.[9] The district here, however, could adjust to Byars' absences without comparable burden. There was no shortage of fully qualified substitute teachers who could be and were called in to replace him at no additional cost to the district.

Accordingly the merits of the district's claim of undue hardship must turn on whether substantial evidence supports the trial court's finding, contrary to that of the commission, that Byars' absences and his replacement by substitutes had a substantial detrimental effect on the educational program of the district. (See *Pasadena Unified Sch. Dist.* v. *Commission on Professional Competence, supra,* 20 Cal.3d 309, 314.) The finding here is not thus supported. Though there is evidence that instruction by a regular teacher is generally preferable to instruction by a substitute, such evidence falls short of showing that Byars' absence for five to ten holy days a year imposed a hardship sufficiently severe to warrant disqualifying him from employment as a teacher. ■ By statute each teacher is allowed at least 10 days of paid leave each year for illness or "personal necessity." (Ed. Code, §§ 44978, 44981.) A district unwilling to pay for leave for religious purposes as a personal necessity must then accommodate those purposes by allowing a reasonable amount of unpaid leave. (See *California Teachers Assn.* v. *Board of Trustees* (1977) 70 Cal.App.3d 431, 442 [138 Cal.Rptr. 817].) The unpaid leave required for Byars' religious observances would not be unreasonably burdensome. The superintendent's objections to the use of substitute teachers were essentially that it takes time for the substitute to establish an effective relationship with the class and that lesson plans do not furnish the substitute with enough information. The fact that most classes missed by Byars were on consecutive days and taught by the same substitute provided more continuous time for the substitute's orientation than if Byars' absences had been sporadic. The fact that Byars knew the dates of his absences well in advance enabled him to furnish detailed lesson plans

[9]The conclusion that accommodation conflicting with the seniority agreement was not required was held supported by a provision of the act that application of " 'a bona fide seniority or merit system' " is not a violation if not the result of intentional discrimination. (*Hardison,* 432 U.S. at pp. 81-82 [53 L.Ed.2d at p. 129], quoting 42 U.S.C. § 2000e-2(h).)

the quality of which is not disputed. Finally, the uncontradicted evidence that teachers in nearby school districts were permitted the absences denied Byars reinforces our conclusion that as a matter of law the district, by seeking to dismiss him, failed to make reasonable accommodation for his religious practices.

The district argues that our conclusion conflicts with *Hildebrand* v. *Unemployment Ins. Appeals Bd.* (1977) 19 Cal.3d 765 [140 Cal.Rptr. 151, 566 P.2d 1297]. There the plaintiff, also a member of the Worldwide Church of God, was discharged in 1973 from her employment in a vegetable packing plant for declining on religious grounds to continue to work Saturdays and then was denied unemployment insurance benefits for having "left [her] most recent work voluntarily without good cause" (Unemp. Ins. Code, § 1256). A subsequently enacted section exempts, from that ground for denial, an employee deprived of employment because of religious creed unless the deprivation is "based upon a bona fide occupational qualification." (Unemp. Ins. Code, § 1256.2.) This court construed the combined sections as precluding benefits to one who voluntarily accepts work under conditions known to conflict with her or his religion and then leaves the job because the conditions seem unacceptable. (*Hildebrand,* 19 Cal.3d at p. 772.) The court said that it was "certainly arguable" that the requirement of Saturday work was a bona fide occupational qualification in view of the employer's announcement at the beginning of the season that all employees would have to work every Monday through Saturday (and sometimes on Sunday) because of uncertain harvesting conditions and the perishable nature of the crop being packed. On the basis of *Trans World Airlines, Inc.* v. *Hardison, supra,* 432 U.S. 63, it was further suggested that, if the Civil Rights Act of 1964 were applicable, the Saturday work requirement would be consistent with the employer's duty under that act to accommodate for employees' religious observances. *Hildebrand* clearly is distinguishable. Byars at no time voluntarily accepted working conditions conflicting with his religion but, from the time he joined his church, refused to work on any holy day. He then was subjected to dismissal proceedings even though the district could reasonably have accommodated for his absences. Further, in *Hildebrand* the court construed only sections 1256 and 1256.2 of the Unemployment Insurance Code and did not consider article I, section 8 of the California Constitution.

*Stimpel* v. *State Personnel Bd.* (1970) 6 Cal.App.3d 206 [85 Cal.Rptr. 797], cert. den., 400 U.S. 952 [27 L.Ed.2d 258, 91 S.Ct. 245], also relied on by the district, predates adoption of article I, section 8 and cannot be reconciled with the duty of accommodation to employees' religious

practices imposed by that section. Stimpel, a Seventh Day Adventist, was employed by the State of California as a construction inspector and for almost 18 months performed his duties without working on his Saturday Sabbath. He then was assigned to a project that he was told would require him to make inspections on Saturdays. His employment was terminated for unexcused absences; and he sought reinstatement (Gov. Code, § 19503), contending that " 'in the absence of substantial evidence establishing the extent of the burden upon the state agency to adjust its schedule to fit [his] religious beliefs and practices,' his 'freedom of religion has been restricted by state action which does not meet the constitutional tests of necessity' " (*Stimpel,* 6 Cal.App.3d at p. 209). Rejecting the contention, the Court of Appeal stated: "The proliferation of religions with an infinite variety of tenets would, if the state is required as an employer to accommodate each employee's particular scruples, place an intolerable burden upon the state. We conclude that if a person has religious scruples which conflict with the requirements of a particular job with the state, he should not accept employment or, having accepted, he should not be heard to complain if he is discharged for failing to fulfill his duties." (*Id.,* at pp. 209-210.) ■ That categorical rejection of any employer's duty to accommodate employees' religious practices conflicts with article I, section 8 and therefore does not correctly articulate present law.

■ The district contends that requiring it to accommodate Byars' religious observances contravenes the establishment clause of the First Amendment to the federal Constitution, which prohibits "law[s] respecting an establishment of religion" and is made applicable to the states by the Fourteenth Amendment (*Wolman* v. *Walter* (1977) 433 U.S. 229, 232 [53 L.Ed.2d 714, 723, 97 S.Ct. 2593]). The clause is not violated, however, by a law that (1) has a secular purpose, (2) has a primary effect that neither advances nor inhibits religion, and (3) avoids excessive governmental entanglement with religion. (*Committee for Public Education* v. *Nyquist* (1973) 413 U.S. 756, 772-773 [37 L.Ed.2d 948, 962-963, 93 S.Ct. 2955].) The district argues that ordering it to accommodate Byars' holy days has the purpose and primary effect of giving him preferential treatment because of his religion, thereby advancing the interests of his church.

The validity under the establishment clause of the imposition on employers by the Civil Rights Act of 1964 of a duty of reasonable accommodation to employees' religious practices (42 U.S.C. § 2000e(j)) has not been directly decided by the United States Supreme Court. (See *Trans World Airlines, Inc.* v. *Hardison, supra,* 432 U.S. 63, 89-91 [53

L.Ed.2d 13, 134-136] (Marshall, J. dis.); *Cummins v. Parker Seal Company* (6th Cir. 1975) 516 F.2d 544) (two-to-one decision upholding constitutionality), affd. by equally divided court, 429 U.S. 65 [50 L.Ed.2d 223, 97 S.Ct. 342]; Wheeler, *Establishment Clause Neutrality and the Reasonable Accommodation Requirement* (1977) 4 Hastings Const.L.Q. 901, 915.) We think it clear that the purpose and the primary effect of imposing a similar duty of accommodation under article I, section 8 of the California Constitution are not to favor any religion but to promote equal employment opportunities for members of all religious faiths. The neutrality commanded by the establishment clause does not require the district to extend its accommodation for Byars' religious observances to other employees who seek time off for secular purposes. Without violating the establishment clause, governments may lighten the burden consequent on religious practices through laws that are "secular in purpose, evenhanded in operation, and neutral in primary impact." (*Gillette v. United States* (1971) 401 U.S. 437, 450 [28 L.Ed.2d 168, 181, 91 S.Ct. 828] (exemption of religious conscientious objectors from compulsory military service); see *Walz v. Tax Commission* (1970) 397 U.S. 664 [25 L.Ed.2d 697, 90 S.Ct. 1409] (property tax exemption for churches).) Unlike the paid three-hours-off for state employees on Good Friday, found violative of the establishment clause in *Mandel v. Hodges* (1976) 54 Cal.App.3d 596, 610-615 [127 Cal.Rptr. 244, 90 A.L.R.3d 728], the reasonable accommodation for Byars' religious observances required by article I, section 8 does not necessitate expenditure of money or preference of one religion over another. On the contrary, the effect of the accommodation is simply to lessen the discrepancy between the conditions imposed on Byars' religious observances and those enjoyed, say, for observances by adherents of majority religions as a result of the five-day week and the Christmas and Easter vacations of regular school calendars.

■ Article I, section 8 does not require full equality of treatment of all employees' religious practices under all circumstances. It does require whatever reduction of inequality of treatment is possible through reasonable steps that do not impose undue hardship on employers.

The judgment is reversed with directions to deny the writ.

Bird, C. J., Tobriner, J., and Mosk, J., concurred.

**CLARK, J.**—I dissent.

However the majority rationalize the factual record in this case, it remains clear that Thomas Byars was absent without permission from five to ten school days in each of the four school years immediately preceding

his dismissal as a public school teacher. Byars was advised on numerous occasions that his contemplated absences on normal school days would not be excused, yet he deemed he had a superior, unilateral right to not perform duties he had contracted with the school district to perform. No one would challenge the propriety of Byars' discharge on these facts, absent his claimed constitutional right to exercise his religious beliefs.[1]

The majority hold that Byars' dismissal based on absences due to his religious practices caused him to be "disqualified from . . . pursuing . . . [an] employment because of . . . creed" (see Cal.Const., art. I, § 8). (*Ante,* p. 172.) The majority curiously arrive at such conclusion on an analysis of cases arising out of the Civil Rights Act of 1964 notwithstanding the fact that Byars is *not* pursuing any remedy under that act. The net result of such analysis appears to be that an employer is required to make "reasonable accommodation" (*ante,* p. 174) of an employee's religious practices. The California constitutional prohibition against disqualification from employment because of creed, according to the majority, should be similarly construed to reasonably accommodate an employee's religious practices. "Just as the First Amendment protects religious practices from interference in the absence of a compelling state interest . . . article I, section 8 forbids disqualification of employees for religious practices unless reasonable accommodation by the employer is impossible without undue hardship." (*Ante,* p. 174.)

The majority seriously err in treating the issue as if we deal with a law compelling employers to accommodate employees in their religious practices. We deal with no such compulsion, either statutory or constitutional. The constitutional provision relied upon by the majority deals only with disqualification from entering or pursuing a profession because of "creed." The ecclesiastical meaning of "creed" is "A brief, authoritative

---

[1]Although the majority rely on administrative findings to discount the impact of Byars' absences on the district's educational program (*ante,* p. 171), the trial court—whose judgment is the subject of this appeal—expressly found that Byars' absences and the use of substitute teachers had a substantial detrimental effect on the educational program as it affected concerned students. The majority thus assume the role of factfinder and, contrary to trial court findings, conclude that because each teacher is allowed at least 10 days of paid leave each year for illness or personal necessity, a school district must allow an additional 5 to 10 days a year of unpaid leave for religious purposes since such amount of unpaid leave would not be "unreasonably burdensome." (*Ante,* p. 175.) At what point the total of a teacher's absences in a given school year becomes "unreasonably burdensome" is surely a matter for the trier of fact and not for the reviewing court.

doctrinal formula, beginning with such words as 'Credo,' 'Credimus,' 'I believe,' 'We believe,' intended to define at certain points what is held by a congregation, a synod, or a church to be true and essential, and exclude what is held to be false belief . . . ." (Websters New Internat. Dict. (2d ed. unabridged) p. 622.)[2] Thus article I, section 8 in clear language is a prohibition against disqualification from entering a profession solely on the basis of *beliefs* and does not purport to afford an employee, as the majority would hold, any right to be accommodated in the *practice* of his beliefs. The district has *not* disqualified Byars from entering or pursuing the teaching profession because of his "creed." There is no requirement in the constitutional provision that it must reasonably or otherwise accommodate Byars in practicing his creed regardless of the lack of undue or other hardship the district may suffer by such accommodation. The right Byars asserts must be established, if at all, by considerations not dependent on article I, section 8.

The question presented is whether Byars' termination of employment constitutes a violation of the free exercise clause of the First Amendment to the federal Constitution or of article I, section 4 of the California Constitution.[3] It was early established that while laws "cannot interfere with mere religious belief and opinions, they may with practices." (*Reynolds* v. *United States* (1878) 98 U.S. 145, 166 [25 L.Ed. 244, 250]; see also *Cantwell* v. *Connecticut* (1940) 310 U.S. 296, 303-304 [84 L.Ed. 1213, 1217-1218, 60 S.Ct. 900, 128 A.L.R. 1352].) In speaking for a majority of this court in *Gospel Army* v. *City of Los Angeles* (1945) 27 Cal.2d 232, 242 [163 P.2d 704], Justice Traynor stated: "Religious liberty 'embraces two concepts,—freedom to believe and freedom to act. The first is absolute but, in the nature of things, the second cannot be.' " In 1963 the Supreme Court ruled that where it is claimed a state has infringed the free exercise clause, it must be established that not only has the exercise of religion been burdened, but that there is also no compelling state interest justifying the burden. (*Sherbert* v. *Verner* (1903) 374 U.S. 398, 403 [10 L.Ed.2d 965, 970, 83 S.Ct. 1790].)

In *Stimpel* v. *State Personnel Board* (1970) 6 Cal.App.3d 206 [85 Cal.Rptr. 797] (cert. den., 400 U.S. 952 [27 L.Ed.2d 258, 91 S.Ct. 245]), the employment of a state inspector was terminated because he declined to

---

[2]Another meaning of "creed" is "Any formula or confession of religious faith; a system of religious belief, esp. as expressed or expressible in a definitive statement; sometimes a summary of principles or set of opinions professed or adhered to in science or politics, or the like . . . ." (*Id.*)

[3]Article I, section 4, provides in pertinent part: "Free exercise and enjoyment of religion without discrimination or preference are guaranteed."

perform services, as required by his employment, on his Sabbath. In holding that the free exercise clause had not been offended because other employment within his profession was available to the plaintiff, the court stated: "The proliferation of religions with an infinite variety of tenets would, if the state is required as an employer to accommodate each employee's particular scruples, place an intolerable burden upon the state. We conclude that if a person has religious scruples which conflict with the requirements of a particular job with the state, he should not accept employment or, having accepted, he should not be heard to complain if he is discharged for failing to fulfill his duties." (*Id.,* at pp. 209-210.)

This court has approved the foregoing quoted language. In *Hildebrand v. Unemployment Ins. Appeals Bd.* (1977) 19 Cal.3d 765 [140 Cal. Rptr. 151, 566 P.2d 1297], unemployment benefits were denied an employee who—after accepting employment—became a member of the Worldwide Church of God and, like Byars, refused to work on the holy days of that church. When her employment was terminated she sought unemployment insurance benefits. A majority of this court held plaintiff had left work voluntarily without good cause. In principle, *Hildebrand* is indistinguishable from the present case. Each employee became a member of the Worldwide Church of God *after* accepting employment, each thereafter refused to perform services on normal work days declared to be holy days by the church, each was warned that continued adherence to the practice would result in termination of employment, and the employment of each was eventually terminated for that reason.[4] These circumstances were deemed decisive in *Hildebrand* and, in factually distinguishing *Sherbert v. Verner, supra,* 374 U.S. 398, relied on by today's majority, the court stated: "In the matter before us, the condition was knowingly and voluntarily accepted, work commenced, and a change of heart thereafter ensued, doubtless motivated by the very deepest and most sincere of impulses." (*Hildebrand v. Unemployment Ins. Appeals Bd., supra,* 19 Cal.3d 765, 770-771.)

If Byars' exercise of religion is burdened by conditions of his employment, that burden is justified by the interest—in fact, the duty—of the district in maintaining a proper educational program to the end of

---

[4]The majority attempt to distinguish *Hildebrand* on the ground that "Byars at no time voluntarily accepted working conditions conflicting with his religion . . . ." (*Ante,* p. 176.) However, the majority further acknowledge that Byars was hired by the district in 1969 "to render services . . . for such length of time during the school year as the Governing Board of the School District may direct." (*Ante,* p. 170.) Byars accepted all work assignments until the 1971-1972 school year.

insuring the reading, writing and other skills of students exposed to the program. No legitimate claim can be made that the interest in accomplishing such an objective is not a compelling state interest (cf. *Sherbert* v. *Verner, supra,* 374 U.S. 398, 403 [10 L.Ed.2d 965, 970]) and, as stated, we must give effect to the trial court finding that Byars' absences had a substantial detrimental effect on that program.

It seems clear for the foregoing reasons that the termination of Byars' employment is not impermissible under the free exercise clause of either the First Amendment of the federal Constitution or article I, section 4 of the California Constitution.

I am further at a loss to understand how the majority decision in this case is philosophically consistent with that in *Fox* v. *City of Los Angeles* (1978) 22 Cal.3d 792 [150 Cal.Rptr. 867, 587 P.2d 663]. In that case the majority held that the city could not light its windows in a manner to form a Christian cross, as to do so constituted a constitutionally impermissible state involvement with religion. (See *Fox* v. *City of Los Angeles, supra,* 22 Cal.3d 792, dis. opn. of Richardson, J. at p. 817.) The majority stated there that "[g]overnments must commit themselves to 'a position of neutrality' whenever 'the relationship between man and religion' is affected" (*id.,* at p. 798), and that we must guard "against every governmental intrusion, large or small, into the inner sanctum of conscience" (*id.,* conc. opn. of Bird, C. J., at p. 813). Now the majority hold that the state must not be neutral but must get involved with matters of conscience by making accommodations to those who wish to practice their religions at times they have contracted to perform services for the state—an involvement of much greater substance than that of *Fox.* I am aware that the majority will attempt to explain their divergent positions on the ground that the establishment of a religion was at issue in *Fox,* while it is the free exercise of religion which is at issue here. In actuality, however, the exercise of religion mandated by the majority today constitutes a law respecting an establishment of Mr. Byars' religion, rendering the state no longer neutral in the relationship between man and his religion.

I would affirm the judgment.

Richardson, J., and Manuel, J., concurred.

Respondents' petition for a rehearing was denied May 30, 1979. Clark, J., and Richardson, J., were of the opinion that the petition should be granted.