Summary judgment will therefore be entered for the defendant.

**Ronald A. NIEDERHUBER, Plaintiff,**

v.

**CAMDEN COUNTY VOCATIONAL & TECHNICAL SCHOOL DISTRICT BOARD OF EDUCATION, Defendant.**

**Civ. A. No. 79–0567.**

United States District Court, D. New Jersey.

Aug. 21, 1980.

---

1. It should also be pointed out that the disclosure statement says that this clause does *not* apply. It is hard to see how a clause which is inapplicable could be inconsistent with other clauses, regardless of whether state law normally requires the disclosure when it *is* applicable.

Greenberg & Mellk by William S. Greenberg, Trenton, N. J., for plaintiff.

Davis & Reberkenny by Robert F. Blomquist, Cherry Hill, N. J., for defendant.

## OPINION

COHEN, Senior District Judge:

In this civil rights action plaintiff, Ronald A. Niederhuber, challenges his dismissal as a public school teacher on the grounds that the termination of his employment deprived him both of his first amendment right to the free exercise of his religion and of his due process rights under the fourteenth amendment. Jurisdiction of the Court is predicated upon 28 U.S.C. § 1343(3).

Trial was held without a jury and this opinion is filed in lieu of findings of fact and conclusions of law, pursuant to Fed.R. Civ.P. 52(a).

Plaintiff, Niederhuber, was hired as a non-tenured teacher by the Camden County Vocational & Technical School District Board of Education (hereinafter "the Board" or "Board of Education") under a contract of employment which was to run from September 1, 1978 to June 30, 1979. His duties involved teaching handicapped children during discrete periods of the school day.

In 1971 plaintiff became a member of the Worldwide Church of God. One of the tenets of that religion is that members must refrain from performing all work on the sabbath each week and on certain specified holy days during the year. On September 21, 1978 plaintiff submitted a written request to the school superintendent to take personal leave on October 2 and 11, 1978 to observe the religious holy days of Feast of Trumpets and Day of Atonement. His request was approved, and he was granted one day with pay and one day without pay. (Plaintiff was entitled to one day of paid personal leave under the Collective Bargaining Agreement (Ex. D–1)). Following that, he filed a second request for leave on October 4, 1978 to enable him to observe the Feast of the Tabernacles. That holiday ex-

tended from October 16 to October 23, 1978 and would have entailed his missing six consecutive school days. With respect to this request for leave, plaintiff testified that he was told by his immediate supervisor that the superintendent would not approve his request and further remarked that "it would start a bad precedent." Despite this, plaintiff explained to his supervisor that he must still be excused from teaching on the holy days.

In further discussions with his supervisor, concerning his religious absences, plaintiff was asked if he would be observing the same holy days every year. When he replied in the affirmative, he was told that his absences could hurt him in future job evaluations. Niederhuber was assured, however, that he would still have his job when he returned from his six-day absence. The plaintiff also spoke directly to the superintendent about his need for the holidays. The superintendent, while stating that he could not approve Niederhuber's absences, testified that he told him that his position would not be in jeopardy if he did take the time to observe his religion's holy days.

Niederhuber had no further conversations with the school administration concerning his religious absences, and the record indicates that he did absent himself for the required days. Substitute teachers were hired to replace Niederhuber during his absence, and seven of the eight days he missed were deducted from his salary. (See discussion regarding Collective Bargaining Agreement, supra.)

On November 30, 1978 plaintiff notified his supervisor that he must be excused from the last two periods of the following day. He filed a Request for Personal Leave form giving as his reason "very personal business.[1]" From the record it appears that he was told by his supervisor that the two-period absence would be unauthorized but that he should return to the office for further word the next morning. The plaintiff testified that he would not leave school during the two periods unless he had permission to do so.

On the following morning, plaintiff went to his supervisor's office and was told by the secretary that he was "covered" for the two periods of requested leave. This conversation was verified by the testimony of the supervisor's secretary during the trial. Plaintiff left early that day and another teacher from the building stepped in to replace him—the common procedure used whenever teachers needed partial day absences. At no time was he told that he would be charged with insubordination or that he would be fired if he was absent for the two periods. Nor was he ever expressly told not to leave the school during the two periods.

Three days later, on December 4, 1978, Niederhuber's supervisor wrote the following memorandum to the superintendent:

On November 30, 1978 Mr. Niederhuber called my office and informed my secretary that he had to leave school 8th and 9th period for personal business without giving reason. I called him to the office and requested his need for leaving to which he responded "it was very personal which he would not divulge." I informed him that this could not be considered an authorized leave. He replied that "there was nothing he [sic] could do, he [sic] had to go and is prepared to be docked wages if necessary." On December 1, 1978 he did leave to keep his appointment. *This is the same individual who took leave contrary to your disapproval on October 4, 1978.*

(Ex. P-9) (emphasis added). During the trial, plaintiff's supervisor testified that it was not customary for him to notify the superintendent of a teacher's request for leave and that he generally handled the numerous requests himself. He said he did so in this instance essentially because Nie-

1. While not known by any administrative personnel prior to the discovery attending the instant litigation, the reason for plaintiff's absence was to attend a job interview with the New Jersey Division of Mental Retardation in Trenton, New Jersey. Plaintiff testified that he pursued the job opening in Trenton since he felt, based on earlier discussions with his supervisor, that his teaching position in Camden was not secure.

derhuber failed to explain why he needed the absence other than to say "personal business" and because of his past record of taking leave without approval (referring to his unapproved absence during the six-day Feast of the Tabernacles in mid-October). Less than one week later the superintendent wrote back that he would be recommending that Niederhuber be given sixty-days notice of termination of employment at the next Board of Education meeting scheduled for December 21, 1978. (Ex. P–10).

At that Board meeting the superintendent made his recommendation, and the next day the plaintiff was informed by letter that his "services were no longer needed." (Ex. P–6). The superintendent was subsequently advised by counsel that because of the Open Public Meetings Act, N.J.Stat. Ann. §§ 10:4–6 to –21 (West 1976), the plaintiff should have been given an opportunity to request that the Board discussion regarding matters which could effect his employment be held in public, rather than private, session. In accordance with this advice, the superintendent informed plaintiff by a second letter dated December 22, 1978 that the Board would be further discussing his case on January 9, 1979 and that he could, at his request, have the matter discussed in public. The letter also stated that the sixty-day notice of termination would commence upon his receipt of the action taken at the Board's meeting on that date.

Niederhuber requested a public meeting, and on January 9, 1979 he and his New Jersey Education Association (NJEA) field representative appeared at the Board's session. While there is some conflict in the testimony concerning whether the Board asked the plaintiff if he had anything to say, the NJEA representative was given an opportunity to speak on the plaintiff's behalf. However, in his address to the Board, the NJEA representative began by accusing it of committing a misdemeanor under New Jersey law by terminating the plaintiff's employment, and the Board promptly stopped any further discussion. Immediately following that, the Board voted to terminate Niederhuber's employment contract. No further discussion of the reasons underlying the dismissal occurred, and plaintiff was never afforded a written statement of the reasons.

The Board's position is that its decision to discharge Niederhuber was triggered solely by his unauthorized absence from school for the two periods on December 1, 1978, and was completely unrelated to his eight-day absence in October, six days of which were also unauthorized. The plaintiff's response is that the Board's stated reliance upon his two-period absence is mere pretext, and that the actual reason for his dismissal was his eight prior absences to observe his religion's holy days. Plaintiff further contends that even if his two-period absence was a factor contributing to the Board's decision to terminate his contract, the Board would never have reached the same decision if it had not also considered his religious absences in addition to his two-period absence.

The Supreme Court's decision in *Mt. Healthy City School District v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), set forth the applicable rules for analyzing the evidence in this case. There, the board of education decided not to rehire an untenured teacher for various reasons, some of which violated the teacher's right of free speech under the first amendment, and some of which did not. The court stated:

> Initially, in this case, the burden was properly placed upon . . . [the teacher] to show that his conduct was constitutionally protected, and that this conduct was a "substantial factor"—or, to put it in other words, that it was a "motivating factor" in the Board's decision not to rehire him. . . . [The teacher] having carried that burden, however, the District Court should have gone on to determine whether the Board had shown by a preponderance of the evidence that it would have reached the same decision as to . . . [his] reemployment even in the absence of the protected conduct.

*Id.* at 287, 97 S.Ct. at 576 (footnotes omitted).

■ Applying the *Mt. Healthy* guidelines to the evidence introduced here, we find that plaintiff's eight days of religious absences was a "motivating factor" in the superintendent's recommendation that plaintiff be discharged and that the superintendent and Board of Education would not have reached that decision had they relied exclusively on his two-period absence.

We must start from the premise that the penalty of dismissal, especially mid-term, is the most severe sanction that any board of education can impose upon a teacher, and that such an action would not be taken lightly. This would seem to be especially true in the present economic atmosphere, where, it is common knowledge, the competition for teaching positions has never been fiercer and where even the positions of tenured teachers have been threatened. Given these circumstances, we find that the Board's assertion that it discharged the plaintiff for taking unauthorized leave for what, in essence, amounted to one actual class period (the other period was a free period in plaintiff's schedule) to be inconceivable and unsupported by any credible evidence.

The Board does not dispute that plaintiff first sought permission before taking his two-period absence and that he stated that he needed the time for "very personal business." Nor does the Board challenge the fact that plaintiff was told he would be "covered" before he left, *i.e.*, that another teacher would watch his class. And, the Board does not submit that a request for partial day absence is unusual or even uncommon among the members of the teaching staff. The Board, however, insists that what distinguishes plaintiff's request and what justifies his discharge was the fact that he did not divulge the personal nature of his need for the two periods of free time or give two full days of notice.

We are not convinced. We find that the evidence, though circumstantial, links the superintendent's recommendation of dismissal and the Board's subsequent decision to terminate plaintiff's contract, to his religious absences.

First, there is undisputed evidence that in a discussion with plaintiff's supervisor concerning his yearly need for religious leaves of absence, he was told that his excessive absences could hurt his job evaluation. Second, his supervisor testified that the main reason he notified the superintendent of plaintiff's request for two-periods of leave was because of plaintiff's past record of taking unauthorized leave (alluding to his six days of unauthorized religious leave in October) and his concern that this indicated a pattern by plaintiff of taking leave without authorization. It should be noted that apart from his two-period absence in December, plaintiff's only other absences during the school year were the eight days taken in October to celebrate his religion's holy days. The final evidence demonstrating the link between plaintiff's dismissal and his October religious leave can be found in a letter mailed to the superintendent by plaintiff's supervisor just six days before the superintendent said he would be recommending plaintiff's termination. (Ex. P–9, discussed *supra*). In that letter the supervisor notified the superintendent that plaintiff had taken an unauthorized leave of absence for two periods and more importantly stated that "This is the same individual who took leave contrary to your disapproval on October 4, 1978." The tie between the unauthorized religious absences and the unauthorized two-period absence is unmistakable.

Under these circumstances, we find that plaintiff's religious absences were a "substantial factor" both in the superintendent's recommendation of dismissal to the Board of Education and in the Board's subsequent decision to terminate his contract. *See Mt. Healthy City School District v. Doyle*, 429 U.S. at 287, 97 S.Ct. at 576, discussed *supra*.

## I.

Having concluded that the Board of Education dismissed the plaintiff for absences taken to celebrate his religion's holy days, we must next determine whether the Board's action violated his right to the free exercise of his religion under the first amendment.

It should be noted at the outset that though we have found that plaintiff's dismissal was related to his religious absences, we have not discerned any evidence of discriminatory intent. However, it is irrelevant that the Board did not deliberately discriminate against plaintiff's religion or even that his discharge was motivated by strictly secular concerns. The Supreme Court has repeatedly held that: "[Governmental action] neutral on its face may, in its application, nonetheless offend the constitutional requirement for governmental neutrality if it unduly burdens the free exercise of religion." *Wisconsin v. Yoder*, 406 U.S. 205, 220, 92 S.Ct. 1526, 1536, 32 L.Ed.2d 15 (1972) (citations omitted); *cf. Griggs v. Duke Power Co.*, 401 U.S. 424, 431, 91 S.Ct. 849, 854, 28 L.Ed.2d 158 (1971). ("The [Civil Rights] Act [of 1964] proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation. The touchstone is business necessity"). Thus, the critical inquiry is the coercive effect of governmental action as it operates against an individual in the practice of his or her religion. *See Abington School District v. Schempp*, 374 U.S. 203, 223, 83 S.Ct. 1560, 1572, 10 L.Ed.2d 844 (1963).

The burden placed upon plaintiff in the exercise of his faith by the school administration and Board of Education is apparent from the record. Plaintiff's religious beliefs required his absence from school for eight days. His request for unpaid leave of absence for six of those days was refused approval, and he was told by his immediate supervisor that excessive absences could hurt his job evaluation. As a result of this warning and his subsequent discharge, plaintiff has been compelled to forfeit his position in order to follow his religious convictions.

In *Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), a member of the Seventh Day Adventist Church was discharged by her South Carolina employer because she would not work on Saturday, the sabbath of her faith. Unable to obtain other employment because she refused to work on Saturday, she filed a claim for unemployment benefits under the South Carolina Unemployment Compensation Act. That Act provided that a claimant was ineligible for benefits if he or she failed without good cause, to accept suitable work. Based on this provision, the State Unemployment Commission in *Sherbert* refused to grant claimant unemployment benefits. On appeal, the Supreme Court ruled that the denial of benefits abridged claimant's right to the free exercise of her religion. And, in language equally applicable to the present case, the Court remarked that "[g]overnmental imposition of such a choice puts the same kind of burden upon the free exercise of religion as would a fine imposed against appellant for Saturday worship." *Id.* at 404, 83 S.Ct. at 1794. The Court then went on to note that where governmental action clearly infringes upon the right of free exercise of religion, determination of the propriety of that governmental action hinges upon whether some compelling state interest justifies the infringement:

> It is basic that no showing merely of a rational relationship to some colorable state interest would suffice; in this highly sensitive constitutional area, [o]nly the gravest abuses, endangering parament interest, give occasion for permissible limitation." *Thomas v. Collins*, 323 U.S. 516, 530 [, 65 S.Ct. 315, 322, 89 L.Ed. 430].

*Id.* at 406, 83 S.Ct. at 1795.

Defendant Board of Education urges, should this Court find that it terminated plaintiff's contract of employment for the exercise of his religious beliefs that it did so to protect its interest in the "efficient functioning of the educational process." As authority, the Board relies on a series of cases arising under Title VII of the Civil Rights Act of 1964. The Act provides in pertinent part that it is unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual" on the basis of his or her religion. 42 U.S.C. § 2000e–2(a)(1) (1974). The Act further provides that an employer must make "reasonable accommodations" to its employee's religious needs unless the employer can demonstrate that

doing so would constitute "undue hardship." 42 U.S.C. § 2000e(j) (1974); 29 C.F.R. § 1605.1 (1979). *See generally* Edwards & Kaplan, *Religious Discrimination and the Role of Arbitration under Title VII,* 69 Mich.L.Rev. 599 (1971). Thus, the burden is placed on the employer to prove that no reasonable accommodation could be made. While the instant matter has not been brought under Title VII, the analysis employed in those cases which do arise under the Act provides a useful framework for analyzing constitutional questions of free exercise. *See, e. g., Rankins v. Comm'n on Professional Competence of Ducor,* 24 Cal.3d 167, 593 P.2d 852, 154 Cal.Rptr. 907 (1979).

Defendant has placed primary reliance upon the Supreme Court's decision in *Trans World Airlines, Inc. v. Hardison,* 432 U.S. 63, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977). In that case, plaintiff was an aircraft maintenance stores clerk, whose work was in demand by his employer twenty-four hours of every day. The plaintiff, also a member of the Worldwide Church of God, refused to work on all holy days as well as every Saturday so that he could observe the sabbath. TWA, his employer, accommodated his observance of holy days but refused to accommodate his demand to have every Saturday free. The Supreme Court held that the employer's duty of reasonable accommodation under Title VII was not violated with respect to the sabbath days since (1) the plaintiff's job was essential on weekends and he was the only available person on his shift to perform it; and (2) transferring other personnel to take his place would violate the seniority provision of the collective bargaining agreement and entail the payment of premium overtime wages. *See generally The Supreme Court, 1976 Term,* 91 Harv.L.Rev. 265 (1977).

Defendant also cites *Huston v. Local 93, International Union, UAW,* 559 F.2d 477 (8th Cir. 1977), a case factually analogous to *Trans World Airlines, supra.* And, as in that case, the Eighth Circuit ruled that an employer need not change work assignments in order to accommodate his employee's religious beliefs where doing so would violate the seniority provisions of the collective bargaining contract. The defense also relies upon *Jordan v. North Carolina National Bank,* 565 F.2d 72 (4th Cir. 1977). In *Jordan,* the plaintiff was a Seventh Day Adventist and in accordance with the tenets of her faith required leave on Saturday to observe the sabbath. The defendant Bank refused to hire the plaintiff because she stated on her application that she would not accept employment unless the Bank would "guarantee" that she would not have to work on Saturdays. The court upheld the Bank's refusal to hire, finding that accommodating such a "guarantee" would constitute "undue hardship" pursuant to Title VII.

Based on the above cases, defendant Board of Education contends that it should not be required to accommodate plaintiff's religious absences since doing so would constitute "undue hardship" to the school system. We must disagree and find the cases relied upon by the Board to be distinguishable from the case at bar.

The first general distinction is that all of the employees discharged or not hired in the Title VII cases noted by defendant demanded to be excused from work *every* Saturday to observe the sabbath in direct conflict with their employers' weekend work schedules. In contrast, Niederhuber's religious demands here would have conflicted with only five to ten workdays each year—a much less substantial burden. Second, unlike the evidence presented of the employee *shortage* confronting the employer in *Trans World Airlines, supra,* and the difficulty in finding replacement workers at a comparable rate of pay, there was no evidence presented here of any shortage of fully qualified substitute teachers who could be and were called in to substitute for the plaintiff. Nor is there any evidence that hiring substitute teachers would add to the salary costs of the Board, since the plaintiff was willing to take his religious leave without pay. Finally, in contrast to the facts in *Trans World Airlines* and in *Huston, supra,* the excusal of plaintiff's re-

ligious absences and his replacement by substitutes would not force the employer Board of Education to violate any existing seniority agreements.

The Board of Education also asserts that by complying with plaintiff's request for five to ten days of religious leave per year it would be obligated to allow leaves of absence to numerous other teachers "with variant and unpredictable requests for religious holidays." This obligation, according to the Board, would strain the management and the budget of the school system by creating the need for additional clerical employees to field such requests. Nowhere in the record, however, is there any evidence to show that, if plaintiff's beliefs were accommodated, how many, if any, of the religious beliefs of other teachers would require similar accommodation. Without such a factual basis the Court is unable and unwilling to reach a finding of undue hardship. Clearly, if the mere assertion by employers that accommodating the beliefs of one employee will cause undue hardship by forcing them to accommodate the beliefs of all its employees were sufficient, by itself, to relieve them of the duty of accommodation, then "no employer would ever be required to accommodate any religious belief of any employee." *Jordan v. North Carolina National Bank*, 565 F.2d at 72, 78–79 (Winter, J. dissenting).

Finally, the Board contends that allowing plaintiff's religious absences would be detrimental to the students, particularly handicapped students, by depriving them of a "stable and structured learning environment." Again, no evidence was presented to support this assertion. While the Court can speculate that instruction by a regular teacher is preferable to instruction by a substitute, we are unable to find that plaintiff's absence for five to ten days a year is sufficiently detrimental to warrant disqualifying him from employment as a teacher. In this regard, the analysis employed by the California Supreme Court in *Rankins v. Comm'n on Professional Competence of Ducor, supra,* is instructive. There as in this case, the plaintiff was a member of the Worldwide Church of God and was dis-

missed from his teaching position for refusing to work on the holy days. The court found that the teacher's discharge violated the constitutional prohibition against religious discrimination and ruled that in the absence of evidence that the teacher's absences and his replacement by substitutes had a substantial harmful effect on the educational program of the school district, the religious absences must be accommodated. The *Rankins* court then discussed the purpose underlying the duty of accommodation:

> [It] is simply to lessen the discrepancy between the conditions imposed on . . . [plaintiff's] religious observances and those enjoyed, say, for observances by adherents of majority religions as a result of the five-day week and the Christmas and Easter vacations or regular school calendars.

24 Cal.3d at 179, 593 P.2d at 859, 154 Cal. Rptr. at 914.

We recognize, as did the *Rankins* court, that the constitutional right to exercise one's religion does not require "full equality of treatment of all employees' religious practices under all circumstances." *Id.* A case-by-case determination must be made. After examining the competing interests in the case at bar, we have concluded that the Board of Education has failed to demonstrate sufficiently compelling reasons to justify plaintiff's dismissal, or, that accommodation of his religious convictions would result in undue hardship. We acknowledge that the school district may be inconvenienced to some extent by accommodating plaintiff's religious beliefs, but the inconvenience which may result is clearly outweighed by the hardship on the plaintiff if the accommodation is not made.

Plaintiff also urges that the termination of his employment contract deprived him of his right to procedural due process under the fourteenth amendment. Specifically, he contends that the Board's action deprived him of both a property and liberty interest and that he was entitled to notice of the reasons for his termination and a

meaningful opportunity to challenge those reasons at a hearing. *See generally Bishop v. Wood*, 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976); *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Mozier v. Board of Education of Township of Cherry Hill*, 450 F.Supp. 742 (D.N.J. 1978); *Cardona v. Claflen*, No. 75–787 (D.N.J. September 10, 1976). However, in view of our finding that plaintiff's dismissal violated the first amendment, the procedural due process of the decision is irrelevant. We may fashion the appropriate remedy based upon defendant's infringement of plaintiff's first amendment rights. *See Skehan v. Board of Trustees of Bloomsburg State College*, 501 F.2d 31, 38 (3d Cir. 1974), *vacated on other grounds*, 421 U.S. 983, 95 S.Ct. 1986, 44 L.Ed.2d 474 (1975).

## II.

As a result of his unlawful discharge from his teaching position, plaintiff is seeking compensatory damages, reinstatement, punitive damages, and attorney's fees.

■ Turning first to his claim for compensatory damages, we find that plaintiff is entitled to back pay computed from the date of his discharge to the date of judgment which will be entered in this case. *Cf. Shaffield v. Northrop Worldwide Aircraft Services, Inc.*, 373 F.Supp. 937, 944 (M.D. Ala.1974) (plaintiff suing for religious discrimination under Title VII entitled to back pay from date of discharge to date of judgment). Based on the evidence adduced at trial plaintiff suffered a total wage loss in the amount of $3,960.00 during the 1978–79 and 1979–80 school years. It should be noted that plaintiff's interim earnings as a substitute teacher and tutor have operated to reduce the back pay otherwise allowable.

Plaintiff also contends that he is entitled to recover for the distress, mental suffering and emotional anguish which he alleges he suffered as a result of the Board's termination of his contract. While the Court recognizes that he may be compensated for mental and emotional distress under 42 U.S.C.

§ 1983, *see Carey v. Piphus*, 435 U.S. 247, 264, 98 S.Ct. 1042, 1052, 55 L.Ed.2d 252 (1978), he must first prove that "such injury actually was caused," *Id.* In reviewing the record, we find that plaintiff has failed to present any credible evidence to support his allegation of mental and emotional distress. Accordingly, his claim for such damages must be denied.

In addition to the diminution of his wages, we believe that plaintiff can only be made whole again by reinstatement to his former position of employment with the defendant. Accordingly, the Board must reinstate Niederhuber to his former position as a full-time teacher under the same or better terms as his former contract provided. *See Mead v. U. S. Fidelity & Guaranty Co.*, 442 F.Supp. 114, 133–34 (D.Minn.1977).

Plaintiff also seeks punitive damages. Based on the evidence presented at trial, however, we do not believe that punitive damages are warranted. As a general rule, punitive damages are awarded if the defendant's disregard of constitutional rights was "malicious and wanton." *Paton v. La-Prade*, 524 F.2d 862, 872 (3d Cir. 1975). Here the record is barren of any evidence of bad faith or malice. Accordingly, plaintiff's request for punitive damages will be denied.

Finally, plaintiff seeks the recovery of attorneys' fees. Under section 1983, attorneys' fees may be awarded to prevailing parties in the discretion of the court. *See* 42 U.S.C. § 1988 (1974). And "[s]uch awards have repeatedly been held to be appropriate in suits seeking redress for improper dismissal. *E. g., Stolberg v. Members of Board of Trustees*, 474 F.2d 485 (2d Cir. 1973); *Donahue v. Staunton*, 471 F.2d 475, 482–483 (7th Cir. 1972), *cert. denied*, 410 U.S. 955, 93 S.Ct. 1419, 35 L.Ed.2d 687 (1973); *Jinks v. Mays*, 350 F.Supp. 1037 (N.D.Ga.1972). *See Cooper v. Allen*, 467 F.2d 836, 840 (5th Cir. 1972)." *Skehan v. Board of Trustees of Bloomsburg State College*, 501 F.2d at 44. Furthermore, a party seeking to recover under the Civil Rights Act of 1964 will ordinarily be granted attorneys' fees unless special circumstances ren-

282

der such an award unjust. *See Northcross v. Board of Education*, 412 U.S. 427, 428, 93 S.Ct. 2201, 2202, 37 L.Ed. 48 (1973); *McPherson v. School District # 186*, 465 F.Supp. 749, 754–55 (S.D.Ill.1978). We find no such "special circumstances" present here and therefore hold that plaintiff is entitled to recover reasonable attorneys' fees.

The Court will delay the entry of a final judgment pending the determination of a reasonable fee for plaintiff's attorneys. The award will be calculated in accordance with the standards set forth by the Court of Appeals for the Third Circuit in *Lindy Brothers Builders, Inc. v. American Radiator and Standard Sanitary Corp.*, 487 F.2d 161 (3d Cir. 1973) ("*Lindy I*") and *Lindy Brothers Builders, Inc. v. American Radiator and Standard Sanitary Corp.*, 540 F.2d 102 (3d Cir. 1976) ("*Lindy II*"). The following general guidelines must be considered: (1) the number of hours spent in various legal activities by the individual attorneys; (2) the reasonable hourly rate for the individual attorneys; (3) the contingent nature of success, and (4) the quality of the attorneys' work.

If the parties cannot agree on the fee, plaintiff's attorneys shall, within 20 days from this date, file a motion for the allowance along with support as to the reasonableness of the charges.

The defendants may contest the allowance with similar proof, the same to be presented within 10 days after service of plaintiff's demands.

An appropriate order may be submitted by plaintiff's counsel.