**Darrel C. NOTTELSON,
Plaintiff-Appellee,**

**and**

**Equal Employment Opportunity Commission, Intervenor-Appellee,**

**v.**

**SMITH STEEL WORKERS D.A.L.U. 19806, AFL–CIO, and A. O. Smith Corporation, Defendants-Appellants.**

Nos. 80–1678, 80–1705.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 27, 1980.

Decided Feb. 27, 1981.

Rehearing and Rehearing En Banc Denied April 20, 1981.

Kenneth R. Loebel and Sigrid E. Dynek, Milwaukee, Wis., for defendants-appellants.

Lee Boothby, Berrien Springs, Mich., for plaintiff-appellee.

Mark S. Flynn, E. E. O. C., Washington, D. C., for intervenor-appellee.

Before SWYGERT, CUMMINGS and PELL, Circuit Judges.

CUMMINGS, Circuit Judge.

Plaintiff Darrel C. Nottelson brought this action against his employer, defendant A.

O. Smith Corporation (Smith), and his union, defendant Smith Steel Workers D.A. L.U.[1] 19806, AFL–CIO (Union), under 42 U.S.C. § 2000e–5(f)(1) and (3), alleging *inter alia* that defendants had discriminated against plaintiff because of his religion in violation of Title VII of the Civil Rights Act of 1964, as amended (42 U.S.C. § 2000e *et seq.*), in that they failed "reasonably to accommodate" within the meaning of Section 701(j) of that Act (42 U.S.C. § 2000e(j), note 4 *infra*) to plaintiff's religious objection to the payment of union dues. The district court ruled in favor of plaintiff on this claim with respect to both defendants and they have appealed. We affirm with one slight modification of the computation of damages.

I. *Introduction*

Plaintiff, a resident of Menominee Falls, Wisconsin, was a production worker at Smith from October 30, 1947, to July 11, 1975, and a member of the Union from October 30, 1947, to April 15, 1975. The Union is the exclusive bargaining agent for the collective bargaining unit in which plaintiff was employed, and the collective bargaining agreement between Smith and the Union contains a union security clause requiring membership in the Union as a condition of continued employment with Smith.

In May 1966, plaintiff joined the Seventh-day Adventist Church, which teaches that it is morally wrong to be a member of or pay dues to a labor organization. In December 1974, plaintiff informed the Union that he could no longer in good conscience support it financially because of his religious convictions and requested the Union to accommodate his religious objection to the payment of union dues by permitting him to pay an equivalent sum to a non-religious, non-union charity. He ceased paying his dues on January 1, 1975, and to show his good faith began making contributions to the American Cancer Society. The Union refused the requested accommodation and in March 1975 notified plaintiff that he would have to pay his delinquent dues or be discharged from Smith pursuant to the union security clause in the collective bargaining agreement. Smith indicated that it was willing to make an accommodation but not without the Union's approval. Plaintiff thereupon filed a charge of unlawful employment practices with the Equal Employment Opportunity Commission (EEOC) office in Milwaukee, Wisconsin, and the EEOC referred the matter to the appropriate Wisconsin agency on April 2.

On April 15, the Union expelled plaintiff from its membership for failure to pay dues, and on April 17 informed him that he would be discharged. On April 23, plaintiff initiated the present litigation, seeking temporary and preliminary injunctive relief pending final disposition of the charges filed with the EEOC. Smith discharged plaintiff on April 24. On April 30, Judge Warren issued a temporary restraining order which, with extensions, restored plaintiff to his job until July 10. On that date, Judge Warren dismissed the action for want of a present EEOC right-to-sue letter to plaintiff, without prejudice to reinstatement upon receipt of such a letter. 397 F.Supp. 928.

The Union again insisted on plaintiff's discharge and Smith complied, informing plaintiff not to come to work on July 11. He has not returned to employment at Smith since that date. Smith also refused, because of the Union's contractual objection, to defer plaintiff's termination until his six weeks' vacation time was used but did pay him for that period. The EEOC issued plaintiff a right-to-sue letter on July 21, and on October 29, plaintiff filed his second amended and supplemental complaint against defendants pursuant to an October 22 order granting his July 22 motion for leave to do so.

In Count I Smith and the Union were alleged to have discriminated against plaintiff because of his religion in violation of

1. Directly Affiliated Local Union.

Sections 703(a)(1)[2] and 703(c)(1)[3] of the Civil Rights Act of 1964 respectively in that they had failed to show that they could not reasonably accommodate plaintiff's religious observance "without undue hardship" as required by Section 701(j)[4] of the Act. The Union was also alleged to have violated 703(c)(3)[5] of the Act by enforcing the union security provision of the collective bargaining agreement so as to cause Smith to discriminate against plaintiff on the basis of religion. Plaintiff therefore sought reinstatement, actual damages of $50,000, exemplary damages of $100,000 and reasonable attorney's fees (then supposedly amounting to $10,000).

In Count II, plaintiff sought identical relief, alleging that the union security clause of the collective bargaining agreement had been enforced under the sanction of the National Labor Relations Act (NLRA) in contravention of the First, Fourth, Ninth, and Fourteenth Amendments.[6] Sections 8(a)(3) and 8(b)(2) of the NLRA (29 U.S.C. §§ 158(a)(3) and 158(b)(2)) recognize the validity of union security clauses and the concomitant right of a union to demand discharge of an employee for failure to pay dues.

The Union in its responsive pleadings and at trial took the position that enforcement of the union security clause against plaintiff was protected under the NLRA and therefore did not violate Title VII and that Title VII's Section 701(j), as sought to be applied, violated the Establishment Clause of the First Amendment. Smith asserted the affirmative defense of undue hardship, claiming that it had done all it could to accommodate plaintiff without causing the Union to initiate arbitration proceedings to enforce the union security clause and to file an unfair labor practice charge to the same effect under the NLRA.

The district court's findings of fact and conclusions of law are contained in three memorandum opinions reported at 423 F.Supp. 1345, 481 F.Supp. 756, and 489 F.Supp. 94. Judge Warren held first, in denying the Union's motion to dismiss Counts I and II, that the union security provision was not a defense to the Title VII claim. 423 F.Supp. at 1347–1348. Subsequently, he reaffirmed and clarified this ruling in response to defendants' post-trial motion for reconsideration, holding that the anti-discrimination provisions of Title VII take priority over the pro-union security clause provisions of the NLRA. 489

**2.** Section 703(a)(1) (42 U.S.C. § 2000e–2(a)(1)) provides in pertinent part that it shall be an unlawful employment practice for an employer

"to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual * * * because of such individual's * * * religion * * *."

**3.** Section 703(c)(1) (42 U.S.C. § 2000e–2(c)(1)) provides in pertinent part that it shall be an unlawful employment practice for a labor organization

"to exclude or to expel from its membership, or otherwise to discriminate against, any individual because of his * * * religion. * *."

**4.** Section 701(j) (42 U.S.C. § 2000e(j)) provides:

"The term 'religion' includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business."

Although the undue hardship defense is made expressly available only to "employers," it has been held to apply to unions as well. See e. g., *Yott v. North American Rockwell Corp.*, 602 F.2d 904, 909 (9th Cir. 1979); *McDaniel v. Essex International*, 571 F.2d 338, 344 (6th Cir. 1978). The parties here do not contend that Judge Warren erred in so holding in this case (481 F.Supp. at 479), and we note that if the Section were construed otherwise, unions would be armed with an appealing equal protection claim.

**5.** Section 703(c)(3) (42 U.S.C. § 2000e–2(c)(3)) provides in pertinent part that it shall be an unlawful employment practice for a labor organization

"to cause or attempt to cause an employer to discriminate against an individual in violation of this section."

**6.** Pendent Count III arose under the Wisconsin Constitution and was dismissed by the district court on December 20, 1976, on the ground that a state court would be the more appropriate forum for its resolution. 423 F.Supp. at 1348. That ruling is not involved in this appeal.

F.Supp. at 96–97. Following the trial, Judge Warren entered his findings that defendants could have accommodated plaintiff's charity-substitute proposal without undue hardship and that they had therefore violated Title VII by failing to do so. 481 F.Supp. at 759–760. He also held, in denying defendants' motion to reconsider, that Section 701(j) does not violate the Establishment Clause. 489 F.Supp. at 97–98. He declined to decide the constitutional questions raised by plaintiff in Count II of the amended and supplemental complaint because plaintiff had been afforded complete relief on the statutory claim set forth in Count I. 489 F.Supp. at 97.[7]

The final judgment, entered on April 18, 1980, awarded plaintiff back pay, attorney's fees and costs, to be borne equally by Smith and the Union. Smith was ordered to reinstate plaintiff no later than April 28, 1980; plaintiff was ordered to contribute to a non-religious charity to be agreed upon by plaintiff and the Union "an amount equal to the union dues he would have owed had he continued to work at Smith during the relevant period;" and the Union was enjoined from interfering with the judgment by filing a grievance with the National Labor Relations Board. 489 F.Supp. at 98–99.

The Union and Smith filed notices of appeal on May 9 and 15 respectively, and the cases, docketed here as Nos. 80–1678 and 80–1705 respectively, were consolidated by this Court pursuant to motions by the parties. On June 19, we granted leave to the EEOC to intervene on plaintiff's behalf.

## II. *The Duty to Accommodate*

It is undisputed that Title VII requires unions and employers to make a reasonable accommodation of an employee's religiously motivated conduct or to show that to do so would work an undue hardship. Smith concedes that it was so required in this case. The Union, however, has adamantly maintained from the outset of the events leading to this litigation that Title VII is preempted here by the NLRA. As noted, Sections 8(a)(3) and 8(b)(2) of the NLRA permit an employee in a union shop to be discharged for failure to pay union dues. The thrust of the Union's position is that these provisions represent a Congressional determination of the balance to be struck between the national policy of promoting labor peace and the national policy protecting the religious needs of individual employees and therefore constitute an exemption from duty to accommodate otherwise imposed by Title VII.

■ The district court rejected this argument and held that to the contrary Title VII creates an exception to the NLRA's sanction of union security clauses. 489 F.Supp. at 96–97. We agree. As the Sixth Circuit concluded after extensive discussion of this issue, "[t]here is no indication in the text or legislative history of [the NLRA] that Congress intended either subsection 8(a)(3) or 8(b)(2) to strike a balance between the religious needs of individual employees and the security requirements of unions." *McDaniel v. Essex International*, 571 F.2d 338, 342 (6th Cir. 1978). The compromise intended was "between the abuses of compulsory unionism and the problem of 'free-riders'." *Id.*; see also *National Labor Relations Board v. General Motors Corp.*, 373 U.S. 734, 740, 83 S.Ct. 1453, 1458, 10 L.Ed.2d 670. To that end, "[t]he closed shop was outlawed; the union shop was permitted, with the limitation that a union could require an employer to discharge an employee only for failure to pay dues." *McDaniel, supra*, at 342. The question of religious accommodation simply was not addressed when Congress was considering the enactment of Sections 8(a)(3) and 8(b)(2). *McDaniel, supra* at 343.

In addition, the Union's claim that the NLRA established an overriding policy favoring union security provisions is belied by the fact that such provisions are unenforce-

---

7. One of the claims by defendants in this appeal is that the district court erred or abused its discretion in failing to dismiss Count II. Because we agree with the district court that complete relief is afforded plaintiff under Title VII, we find no abuse of discretion and decline to exercise our plenary authority to reach the merits of plaintiff's constitutional claim.

able in states where state law is to the contrary. 29 U.S.C. § 164(b); *Retail Clerks v. Schermerhorn*, 373 U.S. 746, 83 S.Ct. 1461, 10 L.Ed.2d 678. Indeed, they have recently been held subordinate to state statutes requiring a charity-substitute accommodation like the one in issue here for religious objectors. *Lumber Workers Local 2362 v. Wondzell*, 601 P.2d 584 (Alaska Sup.Ct. 1979), appeal dismissed for want of a substantial federal question, 444 U.S. 1040, 100 S.Ct. 724, 62 L.Ed.2d 726. Moreover, there is "no national [labor] policy of higher priority than the elimination of discrimination in employment practices." *McDaniel, supra* at 343; see *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 47, 94 S.Ct. 1011, 1019, 39 L.Ed.2d 147.

Title VII does not itself provide an exemption for unintentional discrimination resulting from the enforcement of union security clauses as it does, for example, for unintentional discrimination resulting from the implementation of a bona fide seniority or merit system. See 29 U.S.C. § 2000e–2(h); *Trans World Airlines v. Hardison*, 432 U.S. 63, 81–82, 97 S.Ct. 2264, 2275, 53 L.Ed.2d 113. Given the absence of such an express exemption and the complete lack of evidence that Congress intended the courts to imply such an exemption from the NLRA, we join with the Fifth, Sixth and Ninth Circuits in holding that the union security provisions of the NLRA "do not relieve an employer or a union of the duty of attempting to make reasonable accommodation to the individual religious needs of employees." *McDaniel, supra* at 343. Accord, *Yott v. North American Rockwell Corp.*, 602 F.2d 904 (9th Cir. 1979); *Burns v. Southern Pacific Transportation Co.*, 589 F.2d 403 (9th Cir. 1978), certiorari denied, 439 U.S. 1072, 99 S.Ct. 843, 59 L.Ed.2d 38; *Anderson v. General Dynamics*, 589 F.2d 397 (9th Cir. 1978), certiorari denied *sub nom. International Association of Machinists and Aerospace Workers of America v. Anderson*, 442 U.S. 921, 99 S.Ct. 2848, 61 L.Ed.2d 290; *Cooper v. General Dynamics, Convair Aerospace Div.*, 533 F.2d 163 (5th Cir. 1976), certiorari denied *sub nom. International Association of Machinists and Aerospace Workers v. Hopkins*, 433 U.S. 908, 97 S.Ct. 2972, 53 L.Ed.2d 1091.

### III. *Undue Hardship*

#### A. The Union

■ The Union argues alternatively that the district court erred in finding that it could have accommodated plaintiff's charity-substitute proposal without undue hardship. At the outset, we reject the Union's claim that the district court applied the wrong legal standard. "Undue hardship" has been determined by the Supreme Court to exist only where the cost imposed is more than "*de minimis.*" *Trans World Airlines v. Hardison*, 432 U.S. 63, 84, 97 S.Ct. 2264, 2276, 53 L.Ed.2d 113. The rationale underlying this determination is that anything more than a *de minimis* cost would result in discrimination against other employees, a result the Court concluded Congress did not intend. The district court plainly applied the *Hardison* standard, finding that the charity-substitute accommodation would impose "only a *de minimis* cost" on the Union (481 F.Supp. at 759) and "would not increase the amount or severity of duties required of [plaintiff's] co-workers" (481 F.Supp. at 760).

■ We also reject the Union's contention that the district court's findings were erroneous because the failure of any individual to pay union dues in a union shop is as a matter of law "always above *de minimis*" in that other workers must pay more than their fair share of the costs of union representation. Because a religious objector under a charity-substitute accommodation bears the same financial burden as his co-workers, he is not, as the Union suggests, a "free rider" seeking something for nothing, and the diversion of his contribution to a charity rather than the Union does not of itself make the accommodation unfair or unreasonable as a matter of law. See *McDaniel, supra*, 571 F.2d at 343; *Burns v. Southern Pacific Transportation, supra*, 589 F.2d at 406–407; *Anderson v. General Dynamics, supra*, 589 F.2d at 401–402.

■ As this Court has already made clear, the determination of whether an accommodation can be made without undue hardship is an issue of fact and will not be set aside unless clearly erroneous. *Redmond v. GAF Corp.*, 574 F.2d 897, 902–903 (7th Cir. 1978). Here the district court's findings are amply supported by the record.

The Secretary-Treasurer of the Union testified that the Union would not be financially injured by the loss of plaintiff's dues, which represented only .02% of the Union's annual budget. The Union presented no evidence that the loss of receipts from plaintiff would necessitate an increase in the dues of his co-workers, and even if such an increase were necessary it would amount only to 2.4 cents per year per employee. In *Burns v. Southern Pacific Transportation Co., supra*, the Ninth Circuit in a case virtually identical to this one held that an increase of 24 cents per year was *de minimis*. 589 F.2d at 407.

There was also no evidence presented that other workers would seek similar accommodations or that the accommodation would lead to labor strife. The Union President admitted that his fear of a "steamroller effect" was purely conjectural and that no other employee had sought such an accommodation. He also admitted that he knew of no harm suffered by a union that had permitted such accommodations, that he had made no effort to contact the officials of any union that had permitted such an accommodation, and that he was aware that the charity-substitute has been officially adopted by the Executive Council of the AFL–CIO (see Joint App. at 430) as an appropriate accommodation of individual religious needs.

■ The burden of making a reasonable accommodation or proving undue hardship was on the Union. *Anderson v. Gener-*

al Dynamics, supra, 589 F.2d at 401. The record shows that the Union in fact flatly refused to make any accommodation[8] and at trial failed to present any evidence of undue hardship. The district court's finding that the Union had violated Title VII by causing Smith to discharge plaintiff because of his religious objection to the payment of dues was therefore not erroneous.

B.  Smith

■ We also conclude that the district court did not err in finding that Smith had violated Title VII. Smith has never disputed the reasonableness of the charity-substitute accommodation itself; its claim is that it could not unilaterally accept this accommodation in disregard of the union security clause in its collective bargaining agreement with the Union. It is well settled, however, that Title VII rights cannot be bargained away and that a collective bargaining agreement therefore does not of itself provide a defense for Title VII violations. See *Robinson v. Lorillard*, 444 F.2d 791, 799 (5th Cir. 1971); cf. *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 51, 94 S.Ct. 1011, 1021, 39 L.Ed.2d 147.

*Trans World Airlines v. Hardison, supra*, on which Smith relies, is not to the contrary. TWA was found not to have violated Title VII in that case because accommodation of the plaintiff's religious objection to working on Saturdays would have required abrogation of the rights of other employees under a bona fide seniority system protected not only under the collective bargaining agreement but under Title VII itself. The Court held only that Congress did not intend such an accommodation, not that compliance with a collective bargaining agreement was a defense to an allegation of employer discrimination. Indeed, the Court expressly stated that "neither a

---

8.  The Union claims to have made an attempted accommodation by offering to permit plaintiff to withdraw from union membership and continue working at Smith if he paid to the Union a service fee equivalent to his dues. In view of the fact that plaintiff's religious objection is to providing financial support to a labor organization, the proposal can hardly be deemed an accommodation, much less reasonable. See *Burns v. Southern Pacific Transportation Co., supra*, 589 F.2d at 406. Indeed, the Union did not suggest this "accommodation" or even bother to answer plaintiff's December 1974 request for an accommodation until May 1975, two weeks after plaintiff had filed this lawsuit.

collective bargaining agreement nor a seniority system may be employed to violate Title VII." 432 U.S. at 79, 97 S.Ct. at 2274.

■ In addition, Smith's position is foreclosed by the statute itself. Section 703(c)(3) makes it unlawful for a union "to cause an employer to discriminate against an individual *in violation of this section,*" thus plainly contemplating that both employer and union would be culpable where the employer accedes to a union's unlawful demand for discriminatory action.

■ It is true, of course, that Smith was caught between a rock and a hard place. The choice was not, however, as Smith would have it, between a no-cost compliance with the Union's demands and the cost of defending itself against the Union in grievance proceedings. The choice was between the cost of grievance proceedings and the cost of defending against and satisfying plaintiff's Title VII claim. The district court recognized that "undergoing grievance proceedings may have cost Smith something," but concluded that Smith "could have lessened its exposure" and protected plaintiff in compliance with Title VII by not acceding to the Union's demand (489 F.Supp. at 98). Smith does not claim otherwise, but relies on the argument that Congress did not intend an employer to accommodate religion in disregard of collective bargaining agreements. For the reasons discussed above, we cannot accept that defense in this case and therefore affirm the district court's finding that Smith violated Title VII.[9]

## IV. *The Constitutionality of Section 701(j)*

Smith and the Union claim that Section 701(j) violates the First Amendment's command that "Congress shall make no law respecting an establishment of religion * * *." We are inclined to agree with the EEOC that we are bound on this issue by the holding in *Rankins v. Commission on Professional Competence*, 24 Cal.3d 167, 154 Cal.Rptr. 907, 593 P.2d 852 (1979). In that case, the California Supreme Court adopted the language of Section 701(j) to interpret a state constitutional provision outlawing employment discrimination as forbidding "disqualification of employees for religious practices unless reasonable accommodation by the employer is impossible without undue hardship," 24 Cal.3d at 174, 154 Cal. Rptr. 907, 593 P.2d 852, and then held that the provision, so interpreted, did not violate the Establishment Clause. The Supreme Court dismissed the appeal, taken under 28 U.S.C. § 1257(2), for want of a substantial federal question. 444 U.S. 986, 100 S.Ct. 515, 62 L.Ed.2d 416. This, of course, is a decision on the merits. *Hicks v. Miranda*, 422 U.S. 332, 343–344, 95 S.Ct. 2281, 2288, 45 L.Ed.2d 223.

The Union attempts to distinguish *Rankins* on the ground that it involved a religious objection to working on certain holy days whereas this case involves a religious objection to union dues. We think this is a distinction without substance. The question in both cases is whether a legislative mandate requiring reasonable accommodation of religious conduct (short of undue hardship) offends the First Amendment. Once it has been determined as a factual matter that an accommodation is reasonable, the nature of the underlying religious objection becomes irrelevant.

Assuming, however, that we are not bound by *Rankins,* we reach the same conclusion under the three-part test enunciated by the Supreme Court for determining whether a statute is permissible under the Establishment Clause. That test provides:

"First, the statute must have a secular legislative purpose; second, its principal

**9.** Plaintiff also claimed that Smith violated Title VII independently by refusing to consider him for a non-union supervisory position. The district court made no findings with respect to this question. The Union argues here in its own defense that the district court should have found Smith liable on that ground and that the Union's refusal to accept the charity-substitute was not the precipitating cause of plaintiff's discharge. Even assuming, however, that Smith committed two independent violations of Title VII, that would not relieve the Union of its liability for failure to accommodate. Therefore, we need not reach the question whether there was a second violation.

or primary effect must be one that neither advances nor inhibits religion * * *; finally, the statute must not foster 'an excessive government entanglement with religion'" [quoting *Walz v. Tax Commission,* 397 U.S. 664, 674, 90 S.Ct. 1409, 1414, 25 L.Ed.2d 697]. *Lemon v. Kurtzman,* 403 U.S. 602, 612–613, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (citations omitted).[10]

■ The purpose of Title VII's antidiscrimination provisions is "to achieve equality of employment opportunities." *Griggs v. Duke Power Co.,* 401 U.S. 424, 429, 91 S.Ct. 849, 852, 28 L.Ed.2d 158; see also *Trans World Airlines v. Hardison, supra,* 432 U.S. at 85, 97 S.Ct. at 2277. Section 701(j), by prohibiting unreasonable refusal to accommodate religiously motivated conduct and practices as well as beliefs, is plainly intended to protect the employment opportunities not only of the victims of overt discrimination but also of individuals who are unintentionally discriminated against because their religious convictions are not reflected in facially neutral majoritarian rules. Cf. *Griggs, supra,* 401 U.S. at 431, 91 S.Ct. at 853. This is a secular purpose. Section 701(j) is also plainly intended to relieve individuals of the burden of choosing between their jobs and their religious convictions where such relief will not unduly burden others. This is also a secular purpose, part of "our happy tradition" of "avoiding unnecessary clashes with the dictates of conscience." *United States v. Macintosh,* 283 U.S. 605, 634, 51 S.Ct. 570, 578, 75 L.Ed. 1302 (Hughes, C. J., *dissenting*); see *Abington School District v. Schempp,* 374 U.S. 203, 294–299, 83 S.Ct. 1560, 1609–1612 (Brennan, J., *concurring*).[11]

■ Application of Section 701(j) does not, as defendants contend, have a primary effect of advancing the interests of religionists over non-religionists or the beliefs of one sect over those of another. Like the statutory exemption to military service for conscientious objectors, it requires no particular sectarian affiliation or theological position and promotes only "the principle of supremacy of conscience." *Gillette v. United States,* 401 U.S. 437, 453, 91 S.Ct. 828, 838, 28 L.Ed.2d 168.[12] It does not confer a benefit on those accommodated, but rather relieves those individuals of a special burden that others do not suffer by permitting them to fulfill their societal obligations in a different manner, as in this case by substituting a charitable contribution for union dues. Such accommodations have generally been held compatible with the Establishment Clause. See, *e. g., Wisconsin v. Yoder,* 406 U.S. 205, 234–236, 92 S.Ct. 1526,

10. Although this test was originally developed in the context of cases involving the expenditure of public funds, *e. g., Lemon v. Kurtzman, supra,* the Supreme Court has recently applied it in a case not involving such an expenditure, *Stone v. Graham,* — U.S. —, 101 S.Ct. 192, 66 L.Ed.2d 199, (*per curiam*), and therefore this test appears to be governing here as well.

11. Defendants argue that Section 701(j) has a non-secular purpose, relying solely on the allegedly impermissible motive of Senator Jennings Randolph, principal sponsor of the Section, in promoting its adoption. While it is true that Senator Randolph expressed some concern for the future viability of his own and other Sabbatarian sects in the absence of an accommodation provision, 118 Cong.Rec. 705 (1972), he also expressed concern for the individuals of all minority religions who are forced to choose between their religion and their livelihood and proposed the provision "in the spirit of religious freedom." 118 Cong.Rec. at 705–706. Even assuming, however, that Senator Randolph had an impermissible motive in addition to a secular motive, the statute would not be

rendered invalid under the Establishment Clause because it states a valid secular purpose on its face. See, *e. g., Palmer v. Thompson,* 403 U.S. 217, 91 S.Ct. 1940, 29 L.Ed.2d 438.

12. The EEOC has consistently interpreted the term "religious" in relevant provisions of Title VII as having the same broad meaning as the term has as used in the religious exemption provision in the selective service statutes. See CD 76–104 (1976), CCH Emp.Prac. ⁋ 6500; CD 72–1301 (1972), CCH EEOC Dec. ⁋ 6338; CD 71–2620 (1971), CCH EEOC Dec. ⁋ 6283; CD 71–779 (1970), CCH EEOC Dec. ⁋ 6180. That Congress intended this construction may be inferred from the fact that Section 701(j) was enacted after the Supreme Court defined "religious" in the selective service context in *United States v. Seeger,* 380 U.S. 163, 85 S.Ct. 850, 13 L.Ed.2d 733, and *Welsh v. United States,* 398 U.S. 333, 90 S.Ct. 1792, 26 L.Ed.2d 308; see *Hecht v. Malley,* 265 U.S. 144, 153, 44 S.Ct. 462, 465, 68 L.Ed. 949.

1543, 32 L.Ed.2d 15; *Zorach v. Clauson,* 343 U.S. 306, 314, 72 S.Ct. 679, 684, 96 L.Ed. 954; *Sherbert v. Verner,* 374 U.S. 398, 409, 83 S.Ct. 1790, 1796, 10 L.Ed.2d 965. The fact that some religions may have more or different kinds of religiously dictated observances than other religions does not invalidate a law that applies to all faiths equally.

Nor does Section 701(j) foster "an excessive government entanglement with religion" under the third branch of the *Lemon* test, *supra.* The government is required only to determine whether a belief is "religious" within the meaning of the statute (see note 12 *supra* ) and whether it is sincerely held, a question of credibility. This is essentially the same determination required in implementing the conscientious objector exemption under the selective service statutes and does not render Section 701(j) invalid.

Finally, we note that when an individual is exempted from military service as a conscientious objector, another individual must go in his place. The cost to the second individual might very well include injury or death and is in any event clearly greater than the *de minimis* cost imposed on others by Section 701(j). Inasmuch as the selective service exemption does not offend the Establishment Clause, see *Gillette, supra,* 401 U.S. at 448–460, 91 S.Ct. at 835–841, it follows necessarily that Section 701(j) on its face and as here applied does not either. See also *Cummins v. Parker Seal Company,* 516 F.2d 544, 551–554 (6th Cir. 1975), affirmed by an equally divided court, 429 U.S. 65, 97 S.Ct. 342, 50 L.Ed.2d 223, vacated and remanded on another ground, 433 U.S.

903.[13] Accordingly, the district court correctly adopted the holding in *Tooley v. Martin-Marietta Corp.,* 476 F.Supp. 1027, 1030 (D.Ore.1979), that Section 701(j) "promotes the free exercise of religion without violating the Establishment Clause."

## V. *Attorney's Fees and Unemployment Compensation Benefits*

The district court held that plaintiff as the prevailing party was entitled to reasonable attorney's fees, to be paid equally by Smith and the Union, pursuant to Section 706(k) of the Civil Rights Act (42 U.S.C. § 2000e–5(k)). 489 F.Supp. at 99. Subsequently the fees award was set at $12,478 (Supplement to Union's Appendix).[14] Smith and the Union argue that plaintiff is not entitled to attorney's fees because they would be paid over to the Seventh-day Adventist Church, which is said to have used this litigation to advance the tenets of its faith. Requiring defendants to pay fees in this situation, they argue, would violate the Establishment Clause.

At the oral argument in this Court, plaintiff's counsel stated that contrary to defendants' assertion he intended to charge plaintiff for his services. Plaintiff's position is that the district court correctly held that he is a prevailing party entitled to reasonable attorney's fees under Section 706(k) and that whatever he elects to do with the funds subsequently is his own business and cannot violate the First Amendment. We agree, and therefore affirm the district court on this issue as well. See *Anderson v. General Dynamics, supra,* 589 F.2d at 402; *Tooley v. Martin-Marietta Corp., supra,* 476 F.Supp. at 1031.

**13.** *Cummins,* decided prior to *Trans World Airlines v. Hardison, supra,* held that the employer in that case could have accommodated without undue hardship the plaintiff's religious objection to working on Saturdays. The Supreme Court remanded the case for reconsideration of that holding in light of *Hardison.* On remand, the Sixth Circuit found *Hardison* controlling and affirmed the district court's finding that no accommodation could be achieved without undue hardship, thereby making it unnecessary to reach the constitutional issue. 561 F.2d 658 (1977) (*per curiam*). Judge Phillips' scholarly discussion of the Establishment Clause and Section 701(j) is nevertheless persuasive authority for the position we take here.

**14.** The district court's September 18, 1980, memorandum and order, denying the Union's motion to reconsider the award of attorney's fees to plaintiff and setting the fees amount, was not available at the time briefs were filed in this Court. On December 3, 1980, we granted the Union's motion to supplement its appendix by adding that memorandum and order.

■ One final point. In holding defendants jointly liable, Judge Warren reduced the total back pay due plaintiff from defendants by the amount of employment benefits paid him. 489 F.Supp. at 98; J.App. 65. However, the amount of those benefits paid and to be paid should be credited only to Smith, the party who financed them under Wis.Stats. 108.16 and 108.18. Since the Union did not contribute to plaintiff's unemployment compensation account, it should not receive credit for payments to him from that account. Otherwise the judgment below remains unchanged.

Judgment affirmed as modified; costs to plaintiff.[15]

PELL, Circuit Judge, dissenting.

The First Amendment of our Constitution treats religion in two respects: Congress shall make no law respecting an establishment of religion but, on the other hand, Congress shall make no law prohibiting the free exercise of religion. Each of these prohibitions is a fundamental part of the heritage of this nation. Many of the early settlers came to the colonies for the purpose of engaging in a free exercise of their religious beliefs, but the need for this freedom of exercise often arose because of the repressive alliance between church and state which tolerated no exercise of other or non-approved religious beliefs. Because it appears to me that the majority opinion crosses the boundary of freedom of exercise into an excessive governmental entanglement with religion, I respectfully dissent.

In reaching the conclusion I have, I have essentially agreed with, and would adopt, the reasoning and analysis of Judge Schwartz in *Anderson v. General Dynamics Convair Aerospace Division*, 489 F.Supp. 782 (S.D.Cal.1980), *appeal docketed*, No. 80–5373 (9th Cir. May 14, 1980).[1] I am not unmindful that that decision has been ap-

pealed to the Ninth Circuit and that oral argument was heard in that court on January 15, 1981. Because of my firm conviction that the correct result was reached by the district court in *Anderson*, I will adhere to that position irrespective of the result that may be reached by the Ninth Circuit in reviewing that case. I also see no reason for adding to the analysis of Judge Schwartz. I will therefore confine myself to a few observations directed to the majority opinion in the present case.

That opinion upholds a charity-substitute accommodation as making the religious objector not a "free rider" seeking something for nothing, and opines that the diversion of his contribution to a charity rather than the Union does not make the accommodation unfair or unreasonable. The Union, however, by law is the legal representative of all employees in the Smith unit and it is required to represent all of such employees without discrimination. Further, by a legally valid contract, the Union is entitled to have all employees in the unit contribute their proportionate share of the cost of that representation. The fact should not be significant that by paying over to a charity an amount equivalent to dues Nottelson expends the same amount of money as does another employee who may not be in favor of the Union representing him but who cannot fall back upon a claimed religious tenet. The merchant who sells merchandise, or the lawyer who sells service, would scarcely regard that he was receiving a quid pro quo to which he was entitled if the price or the fee was instead paid over to a charity no matter how worthwhile or deserving that other recipient might be. No more, it seems to me, should Nottelson be entitled to the services without paying for them in the same manner as his fellow employees. In sum, he is a "free rider," plain and simple.

**15.** In affirming, we have considered all points raised by the parties and the three *amici curiae*. Any points not discussed herein have been deemed too frivolous for discussion.

**1.** The Amicus brief filed in this appeal by the Equal Employment Advisory Council sets forth

in some greater detail than does the *Anderson* opinion, the historical background and argument supporting the position reached in *Anderson*, and fortifies my conclusion as to the correctness of the result reached in *Anderson*.

Referring to the substitution of a charitable contribution for the payment of union dues, where the payment is required for the retention of employment status, as fulfilling "societal obligations" strikes me as indulging in noetic perjinkities divorced from realism. Nor do I think that we can adopt the pragmatic analysis that the loss of a particular payment of dues involves only a very small amount of money. While undoubtedly the Seventh-Day Adventist Church is not the largest denomination in this country, it equally undoubtedly includes a substantial number of people among its adherents. Assuming that Nottelson is relying on a basic tenet of his religion, the result in this test case, litigated by his Church, cannot but have a substantial impact in industrial situations similar to that here involved. We cannot philodoxically avoid the fact of entanglement by simplistically ordaining that Section 701(j) does not have a primary effect of advancing the beliefs of one sect over those of another.

I am not unmindful, as the majority opinion points out, that the Executive Council of the AFL–CIO has adopted the charity-substitute as an appropriate accommodation of individual religious needs. I do not regard this as persuasive on the validity of Section 701(j). No one in this day and age wants lightly to chance the charge of being considered as being guilty of any form of discrimination. When this moral pressure, given teeth by the specific legislative requirement of reasonable accommodation, is considered in the context of making the religious objector be out of pocket at least the same amount of money by payment to a worthwhile charitable organization, it is not surprising that the Executive Council would make the best of a situation even though it is contrary to an objective for which Unions generally have long fought.

The majority opinion, in addressing the constitutionality issue, relies heavily on *Rankins v. Commission on Professional Competence*, 24 Cal.3d 167, 154 Cal.Rptr. 907, 593 P.2d 852 (1979), *appeal dismissed*, 444 U.S. 986, 100 S.Ct. 515, 62 L.Ed.2d 416, which, it is asserted, is binding on this court. That opinion of the California Su-

preme Court, a four-to-three decision, was indeed the subject of a dismissal on appeal as not involving a substantial federal question although three of the Justices "would note probable jurisdiction and set case for oral argument." 444 U.S. 986, 100 S.Ct. 515, 62 L.Ed.2d 416. Nevertheless, this dismissal under *Hicks v. Miranda*, 422 U.S. 332, 95 S.Ct. 2281, 45 L.Ed.2d 223 (1975), as the majority opinion points out, is a decision on the merits. *Rankins*, however, represents no more than an application of *Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) which has never been expressly overruled, irrespective of what impact upon its viability may have resulted from *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977).

The dismissal in view of *Sherbert* is not surprising when the facts of *Rankins* are considered. The plaintiff there simply sought to take off on his holy days and without pay. The California Supreme Court enjoined the dismissal of the plaintiff taking note: "There was no shortage of fully qualified substitute teachers who could be and were called in to replace him at no additional cost to the district." 593 P.2d at 857. Also the California Supreme Court noted that permitting the absence of the plaintiff on his holy days did not constitute a "preference of one religion over another." 593 P.2d at 859. On the contrary, the regular school calendar provided holidays on the principal Christian holy days, so that the effect of permitting absences without pay to plaintiff on *his* holy days "is simply to lessen the discrepancy between the conditions imposed on [the plaintiff's] religious observances and those enjoyed . . . by adherents of majority religions," *id.*

As the company points out in its brief here, in this case, by contrast, the dues exemption creates a religious preference; it does not "lessen" one. In any event, the striking difference in the situations involved in *Rankins* and in the case at bar do not, in my opinion, make the dismissal of the *Rankins* appeal binding on this court. Those striking differences cannot be lightly

brushed aside, as the majority would do, by being referred to as a distinction without a difference.

Having stated my opinion that Section 701(j) is unconstitutional, at least as applied in the present situation, I recognize the possibility of a reservation implicit in my discussion of the lack of reasonableness of the accommodation approved by the majority opinion. That reservation is brought to my mind by *Catholic Bishop of Chicago v. NLRB*, 559 F.2d 1112 (7th Cir. 1977), in which this court held that the Board unconstitutionally exercised jurisdiction over lay teachers in parochial schools. The Supreme Court affirmed the result, *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979), but, in accordance with long established principles of reaching a decision if possible on grounds other than constitutional, held that the Board was exercising jurisdiction beyond the power given it by Congress. The Court recognized that the exercise of jurisdiction "would implicate the guarantees of the Religion Clauses," but declined "to construe the Act in a manner that could in turn call upon the Court to resolve difficult and sensitive questions arising out of the guarantees of the First Amendment Religion Clauses." *Id.* at 507, 99 S.Ct. at 1322.[2] Here, while I recognize the possibility that the case could be disposed of similarly, it does appear to me that in imposing upon employers, and sometimes on unions, the necessity of reasonably accommodating the diverse practices of the many different religions extant in this country, entanglement cannot be avoided and the challenged section should be struck down.

---

**2.** It is of interest, and of some possible significance, that an amicus brief urging affirmance of this court's opinion in *Catholic Bishop* was filed in the Supreme Court on behalf of the General Conference of Seventh-Day Adventists.