**Robert J. GARMAN, Plaintiff,**

**v.**

**UNITED STATES POSTAL SERVICE, William Bolger, Postmaster General, John E. Lawecki, Postmaster, South Bend, Indiana, Defendants.**

**No. S 81–67.**

United States District Court,
N. D. Indiana,
South Bend Division.

March 16, 1981.

Charles S. Leone, South Bend, Ind., for plaintiff.

David T. Ready, U. S. Atty., South Bend, Ind., for defendants.

## MEMORANDUM AND ORDER

### I.

ALLEN SHARP, District Judge.

Pursuant to Section 3 of the Military Service Act, 50 U.S.C. App. Section 453, President Carter issued Proclamation 4771 requiring registration of males born in 1960 and 1961 with the Selective Service System. 45 Fed.Reg. 45247 (July 3, 1980). By the terms of the Proclamation, the registration program began on July 21, 1980 at post offices throughout the nation.

The United States Postal Service ("Postal Service") is authorized to furnish non-postal services to agencies of the United States Government. 39 U.S.C. Section 411. In the past, these services have included the sale of food stamps, the conduct of surveys and, currently, the sale of gold medallions.

Pursuant to this statutory authority, the Postal Service and Selective Service System have entered into an agreement whereby Postal Service personnel at post offices around the country perform various ministerial tasks connected with the Selective Service registration. These tasks involve the distribution of registration forms and informational brochures, review of completed forms for legibility and accuracy and forwarding the completed forms to a data processing center designated by the Selective Service System. These duties do *not* include, however, giving advice or rendering a decision about the registration process, classification systems, exemptions or other substantive matters. These duties have been performed since the commencement of the registration program and continue to be performed by window clerks.

The named plaintiff in this action is a distribution and window clerk at the South Bend, Indiana Post Office. On or about the week of July 14, 1980, plaintiff and all other window clerks were given orders to perform the necessary ministerial duties connected with the Selective Service registration. Plaintiff asserts in his Complaint (Paragraph 11) that he holds certain beliefs and practices which require that he not participate in the Selective Service registration system currently being conducted through the United States Postal Service. Pursuant to Article XV of a collective bargaining agreement between the Postal Service and its unions ("National Agreement"), plaintiff has filed a grievance over the issue, and plaintiff's union, the American Postal Workers Union, has appealed past the second level of the grievance procedure. The appeal is currently pending. Plaintiff also claims in Paragraph 13 of his Complaint that on July 25, 1980 he filed an "equal employment opportunity complaint" and thus "has made known his religious beliefs and practices to the United States Postal Service in South Bend, Indiana." The Court may take notice of the fact that, pursuant to the bid procedure of the National Agreement, plaintiff bid on a manual distribution clerk job, a job that would take him out of his present window clerk duties. Thereafter, on or about February 25, 1981, plaintiff was awarded said manual distribution clerk job. However, plaintiff is required to pass a "scheme examination" with respect to his new job which requires study by plaintiff. Plaintiff has been given ninety (90) days from February 25, 1981 in which to qualify on the "scheme." How long it takes plaintiff to pass depends on how fast plaintiff can learn the scheme. The scheme requirement is required of all employees similarly situated. In the interim, plaintiff remains at his present assignment until he passes said "scheme" exam.

Plaintiff seeks to enjoin the Postal Service from discharging, suspending or otherwise disciplining the plaintiff for his words or actions in opposition to registering individuals from military conscription; threatening him in any way with discipline or loss of job for refusing to participate in the military conscription registration process; taking any retaliatory measures or other adverse actions affecting his employment

status as a result of the religious beliefs or practices of the plaintiff; and further asks that the Postal Service provide reasonable accommodation to the plaintiff because of his religious beliefs and practices. Plaintiff also brings this action pursuant to the First Amendment of the Constitution.

## II.

In his Memorandum in Support of his request for injunctive relief, plaintiff cites and attaches the unpublished opinion in *McGinnis v. U. S. Postal Service*, No. C–80–3472 (N.D.Cal., December 16, 1980) as supportive of his position. This Court has reviewed the carefully drawn 18 page opinion of Judge Thelton E. Henderson. Notwithstanding the excellence of its presentation this Court must respectfully disagree with the result there announced. However, there are two other Postal Service District Court decisions which hold contra to *McGinnis, supra*. First, a similar claim as that asserted by the plaintiff in this action was raised in a suit brought in the Southern District of New York prior to the commencement of the registration program by two Postal Service employees. *Rogg, et al. v. U. S. Postal Service and American Postal Workers Union*, 80 Civ. 80 (RO). In an unpublished memorandum decision and judgment dismissing the complaint, United States District Judge Richard Owen rejected such claims, finding that no religious or constitutional right was infringed by requiring employees to perform "the ministerial act" of processing registration documents, notwithstanding the fact that one named plaintiff, a Jehovah's witness, stated a religious basis for his objection.

In addition, similar allegations of constitutional and religious infirmities were dismissed by District Judge Mark Costantino in *Rosenthal, et al. v. U. S. Postal Service*, Civ. 80–3013 (D.C.E.D.N.Y. December 3, 1980). In addressing the issue of the plaintiff's First Amendment rights, Judge Costantino said:

> To label this processing procedure 'speech' would mandate that every post office function, like mail delivery, be sub-

ject to similar appellation once an employee refuses to perform some administrative task for political, philosophical or moral reasons. Such reasoning will not be countenanced by this court since this logic attempts to reach conduct which is clearly not within First Amendment protection. (Page 3 of Exhibit B).

He concluded:

> Notwithstanding the analysis above, the motion must be denied since the requirement of Selective Service registration is not a denial of one's freedom of religion, *United States v. Reiss*, 478 F.2d 338 (2nd Cir. 1973); *United States v. Bertram*, 477 F.2d 1329 (10th Cir. 1973), and thus the mere processing of the draft registration forms necessarily does not impinge upon First Amendment rights. *See Rogg v. United States Postal Service*, 80 Civ. 80 (S.D.N.Y. July 18, 1980) (Owen, D. J.). The motion therefore is denied and the stay on Rosenthal's suspension is removed. (Page 4 of Exhibit B).

A requirement that all eligible persons register for the draft infringes on the rights of those who oppose military service based on religious or other convictions have been uniformly rejected for the past several decades. *Richter v. United States*, 181 F.2d 591, 593 (9th Cir. 1950), *cert. den.*, 340 U.S. 892, 71 S.Ct. 199, 95 L.Ed. 647 (1950). The courts have squarely held that "the requirement (of Selective Service registration) does not infringe or curtail religious freedom since registering is not religious interference (citing cases)." *United States v. Bertram*, 477 F.2d 1329, 1330 (10th Cir. 1973). See also, *United States v. Baechler*, 509 F.2d 13, 15 (4th Cir. 1974, *cert. den.*, 421 U.S. 993, 95 S.Ct. 2000, 44 L.Ed.2d 483; *United States v. Bigman*, 429 F.2d 13 (9th Cir. 1970); *United States v. Crocker*, 308 F.Supp. 998 (D.C.Minn.1970), *aff'd*, 435 F.2d 601 (8th Cir. 1971).

It is pointed out that the reasoning in *Bertram, supra*, was also used by Judge Owen in *Rogg, supra*, wherein he held:

> Since the act of registration is not an interference with the free exercise of one's religion, *United States v. Bertram*,

477 F.2d 1329 (10th Cir. 1973), *a fortiori* the ministerial act of furnishing, checking and receiving completed registration forms by plaintiffs cannot be an unconstitutional interference with plaintiffs' religious freedom.

It is clear that there is no constitutional or religious right which exempts an individual from registration. Plaintiff asserts, in essence, that since he was recognized by the Selective Service as a conscientious objector in 1970 and served two (2) years in alternate civilian service, he thus has a legitimate ground for his assertion that he should not register selective service registrants. However, it is respectfully submitted that plaintiff's statutory exemption applied only to his participation in the military and did not exempt him from registering with Selective Service.[1] Thus, plaintiff himself had to register with Selective Service.

■ In terms of any arguable "free speech" concerns, the ministerial tasks of distributing and processing registration forms has no speech component that would come within the First Amendment protection. As the Supreme Court speaking through Chief Justice Warren noted in connection with the act of burning a registration card, "We cannot accept the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea." *U. S. v. O'Brien*, 391 U.S. 367, 376, 88 S.Ct. 1673, 1678, 20 L.Ed.2d 672 (1968). District Judge Costantino, in the

*Rosenthal* case, *supra*, (quoted on page 509 herein) recognized the above in reaching his First Amendment findings.

■ The Postal Service's "condition"—that all window service employees distribute and process registration forms—is neutral in its purpose of providing assistance of a technical nature for Selective Service registration and is not designed to control, nor does it have the effect of controlling, political or religious belief or expression. See *United States v. O'Brien*, 391 U.S. at 375, 88 S.Ct. at 1678 (statute prohibiting destruction of registration card neutral with respect to speech). As such, the Postal Service's requirement does not implicate First Amendment rights.[2]

### III.

In the non-federal government Title VII case of *Ekanem, et al. v. Health & Hospital Corporation of Marion County, et al.*, 589 F.2d 316 (7th Cir., decided December 21, 1978, rehearing *en banc* January 18, 1979), the Seventh Circuit Court of Appeals held that:

> To succeed in obtaining a preliminary injunction, a plaintiff seeking reinstatement in an employment case, like any other plaintiff, 'must establish a reasonable probability of success on the merits, irreparable injury, the lack of serious adverse effects on others, and sufficient public interest.' 589 F.2d at 319 (emphasis added).

1. The particular statutory exemptions from military service pertinent herein, which are found in 50 U.S.C. App. Section 456(j), apply only to deferments and exemptions from training and service of those who are "by reason of religious training and belief . . . conscientiously opposed to participating in war in any form." However, as pointed out above, persons who properly claim the exemption are nonetheless first required to register. [50 U.S.C. App. Section 453. See *United States v. Reiss*, 478 F.2d 338 (2nd Cir. 1973)].

2. The Supreme Court recently noted the distinction between regulations of the type considered in *O'Brien* and in this case and those that regulate speech *per se*. The Court wrote

in the context of patronage employment demands:

> *O'Brien* dealt with the constitutionality of laws regulating the 'nonspeech' elements of expressive conduct. No such regulation is involved here, for it is association and belief *per se*, not any particular form of conduct, which patronage seeks to control . . . [C]ontrary to *O'Brien's* proscription, under patronage 'the alleged governmental interest in regulating conduct arises in some measure because the communication allegedly integral to the conduct is itself thought to be harmful.' *391 U.S.*, at 382, 88 S.Ct., at 1682. *Elrod v. Burns*, 427 U.S. at 364 N. 17, 96 S.Ct. at 2685 N. 17.

In this case, plaintiff is unable to show that he satisfied any of the above four prerequisites. First, plaintiff cannot establish a reasonable success on the merits. Defendants have established that the act of registration with the Selective Service is not an interference with the free exercise of one's religion. *United States v. Bertram, supra; United States v. Reiss, supra; Rogg v. United States Postal Service, supra*; and *Rosenthal v. United States Postal Service, supra.* The great weight of two Circuit Court of Appeals decisions and, additionally, two District Court decisions involving the very same issue as here that have denied injunctive relief, strongly establish that plaintiff will not prevail on the merits of his claim.

In terms of *Ekanem, supra*'s, requirements of lack of serious adverse effects on others and sufficient public interest and, notwithstanding that the requirement of Selective Service registration is not a denial of one's freedom of religion, the legitimate concerns of the Postal Service and the public outweigh any arguable First Amendment religious rights of plaintiff.

The First Amendment in no way abrogates all conditions of public employment, even those directly or indirectly affecting political or religious expression. For example, courts have upheld the requirement that a public employee take a loyalty oath which is narrowly drawn as a condition to public employment. *E. g., Cole v. Richardson*, 405 U.S. 676, 92 S.Ct. 1332, 31 L.Ed.2d 593 (1972); *Biklen v. Board of Education*, 333 F.Supp. 902 (N.D.N.Y.1971) (three judge court), *aff'd*, 406 U.S. 951, 92 S.Ct. 2060, 32 L.Ed.2d 340 (1972). Nor must an employer tolerate disruptive unlawful conduct, even in the name of protest over alleged unconstitutional employment practices. See, *McDonnell Douglas Corp. v.*

*Green*, 411 U.S. 792, 803–04, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973) (unlawful protest valid basis for discharge under Title VII; and *Gonzalez v. Bolger*, 486 F.Supp. 595 (D.D.C.1980).

The condition imposed by the Postal Service on plaintiff's employment—that he perform the duties assigned to him, including distribution of registration forms—is squarely a legitimate condition. At the heart of the employee-employer relations and essential to the proper functioning of any business is the employer's right to expect his employees to perform the duties assigned or face the consequences of a disciplinary action. The First Amendment is not a license to employees to perform only those duties which meet their private approval.[3] The chaos that would result from such a holding is obvious; in the context of the vital services performed by the Postal Service. For example, claiming this extended religious First Amendment protect, a postal carrier could refuse to deliver to a registrant a letter confirming his registration or even an induction notice, or could refuse to deliver any mail either to or from the Department of Defense, or the Departments of the Army or Navy. Similarly, a postal clerk could refuse to deliver and/or process mail which was addressed to or had a return address of the Defense Department, Selective Service System, Departments of the Army, Navy, etc., or for that matter, could refuse to process income tax forms on the basis that income taxes support the military. Similar consequences prompted Justice Cardozo to observe, in the course of rejecting constitutional claims by state university students to exemption from taking a statutorily required course in military science, that:

3. Recognition of interests similar in kind to the Postal Service's interest in prescribing work duties—the legitimate interest of schools in prescribing curriculums for example—have prompted courts to deny First Amendment protection to teachers who refuse to teach portions of the curriculum to which they are fundamentally opposed for political or religious reasons. *E. g., Palmer v. Board of Education*, 603 F.2d 1271 (7th Cir. 1979); *Adams v. Campbell County School District*, 511 F.2d 1242 (10th Cir. 1975); and *Clark v. Holmes*, 474 F.2d 928 (7th Cir. 1972), *cert. denied*, 411 U.S. 972, 93 S.Ct. 2148, 36 L.Ed.2d 695 (1973). These cases establish that the "First Amendment was not a teacher license for uncontrolled expression at variance with established curricular content." *Palmer v. Board of Education*, 603 F.2d at 1273.

The conscientious objector, if his liberties were to be thus extended, might refuse to contribute taxes in furtherance of a war, whether for attack or for defense, or in furtherance of any other end condemned by his conscience as irreligious or immoral. The right or private judgment has never yet been so exalted above the powers and the compulsion of the agencies of government. One who is a martyr to a principle—which may turn out in the end to be a delusion or an error—does not prove by his martyrdom that he has kept within the law. *Hamilton, et al. v. Regents of University of Cal.*, 293 U.S. 245, 268, 55 S.Ct. 197, 206, 79 L.Ed. 343 (1934).

Balanced against the Postal Service's weighty interests—the orderly functioning of the system of the distribution of mail, providing effective assistance to other federal agencies, implementation of the registration program mandated by presidential proclamation and avoiding unfairly shifting additional burdens to fellow employees— plaintiff's alleged interest in avoiding handling of forms relating to activities which he personally disapproves is *de minimus*.

The infringement of plaintiff's alleged religious First Amendment rights is clearly justified by the compelling interests of the Postal Service and the public. Accordingly, even under any sort of balancing test, plaintiff's claims must fail, both for purposes of a preliminary injunction and on the ultimate merits of the claims.

The most recent case in this Circuit on the duty to accommodate an employee's religious convictions is *Nottelson v. Smith Steel Workers D.A.L.U. 19806, AFL–CIO*, 643 F.2d 445 (7th Cir. 1981). It follows and relies on *TWA v. Hardison*, 432 U.S. 63, 97 S.Ct. 2264, 53 L.Ed.2d 113 and *Redmond v. GAF Corp.*, 574 F.2d 897 (7th Cir. 1978). There is nothing in *Nottelson* or the authorities therein cited that compels the granting of a preliminary injunction in this case.

## IV.

Plaintiff's application for a preliminary injunction fails to satisfy the prerequisite of irreparable injury under the ruling of *Sampson v. Murray*, 415 U.S. 61, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974). In *Sampson*, a probationary employee had been dismissed from federal employment allegedly without observance of her procedural rights. The Supreme Court, reversing the order below enjoining plaintiff's dismissal pending her pursuit of an administrative appeal, established the standards which govern the issuance of temporary injunctive relief in cases challenging a discharge from government employment:

> The District Court, exercising its equitable powers, is bound to give serious weight to the obviously disruptive effect which the grant of the temporary relief awarded here was likely to have on the administrative process. When we couple with this consideration the historical denial of all equitable relief by the federal courts in [such] cases . . . , the well established rule that the government has traditionally been granted the widest latitude in the dispatch of its own internal affairs, . . . and the traditional unwillingness of courts of equity to enforce contracts for personal service either at the behest of the employer or of the employee, . . . [W]e do believe that [plaintiff] at the very least must make a showing of irreparable injury sufficient in kind and degree to override these factors cutting against the general availability of preliminary injunctions in Government personnel cases. *Sampson v. Murray*, 415 U.S. at 83–4, 94 S.Ct. at 949–950 (citations omitted).

In *Sampson*, the employee being discharged alleged three (3) types of "irreparable injury": (1) she might be deprived of her income for an indefinite period, (2) spurious and unrebutted charges against her might remain on the record, and (3) she would suffer the embarrassment of being wrongfully discharged in the presence of her co-workers. See, *Sampson v. Murray*, 415 U.S. at 89, 94 S.Ct. at 952. The Supreme Court held as a matter of law that such allegations do not establish the requisite "irreparable injury":

Assuming for the purpose of discussion that respondent had made a satisfactory showing of loss of income and had supported the claim that her reputation would be damaged as a result of the challenged agency action, we think the showing falls far short of the type of irreparable injury which is a necessary predicate to the issuance of a temporary injunction in this type of case. *Sampson v. Murray*, 415 U.S. at 91–2, 94 S.Ct. at 953–54.

Although plaintiff does not mention *Sampson*, he apparently claims an exception from the *Sampson* rule by virtue of the First Amendment content of his claims. However, the latter fails as *Sampson*, in fact, involved constitutional due process claims. Furthermore, in the preliminary injunction case of *Diliberti v. Brown*, 583 F.2d 950 (7th Cir. 1978) the Seventh Circuit found that there was no irreparable injury to a discharged employee merely because a constitutional claim itself was raised. Accordingly, to the extent that any First Amendment interest is even arguably implicated in this case, that implication is so indirect and to such a slight degree that the interests of the public and the Postal Service clearly outweigh such *de minimus* infringement. Thus, it is respectfully submitted that in this case, the mere invocation of religious First Amendment rights should not automatically trigger rejection of the otherwise sound counsel of *Sampson, supra.*

The irreparable injury issue in *Sampson* was also discussed by the Seventh Circuit Court of Appeals in *Ekanem, supra.* In pointing out the *Sampson* holding that an extremely strong showing of irreparable injury is necessary before a Court can invoke the extraordinary remedy of injunctive relief, the Seventh Circuit, in reversing the District Court's issuance of a preliminary injunction noted:

> Ekanem waited fourteen months after filing his lawsuit before he sought a preliminary injunction, thus undercutting any claim of irreparable harm. His failure to obtain other employment after being terminated by the Corporation does not show irreparable injury. 489 F.2d at 321 (fn. omitted).

In this, the Postal Service has been processing registration forms since July 1980. Thus, with respect to plaintiff, the matter has been an issue since that date. Yet, now, some eight (8) months later, plaintiff brings this action for a preliminary injunction. Furthermore, plaintiff's late claim of irreparable injury is further undercut by the fact that on or about February 25, 1981, two (2) days before plaintiff filed his request with the Court, plaintiff was awarded, pending his qualification on the scheme test, a clerk position which would not require him to work at a window and, thus, would free him from processing any more registration forms. Accordingly, pursuant to *Ekanem, supra*, the facts of this case undercut any arguable claim of irreparable injury.

### V.

In *Brown v. General Services Administration*, 425 U.S. 820, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976), the Supreme Court of the United States held that the exclusive remedy in employment discrimination suits in the federal government is Section 717(c) of the Civil Rights Act of 1964. In this connection, the court held that there must be exclusive adherence to the "exclusive preemptive administrative and judicial scheme for redress of federal employment discrimination." 425 U.S. at 829. The court specifically stated:

> Section 717(c) permits an aggrieved employee to file a civil action in a federal district court to review his claim of employment discrimination. Attached to that right, however, are certain *pre-conditions.* Initially, the complainant must seek relief in the agency that has *allegedly discriminated against him.* He then may seek further administrative review with the Civil Service Commission or, alternatively, he may, within 30 days of receipt of notice of the agency's final decision, file suit in federal district court without appealing to the Civil Service Commission. If he does appeal to the

Commission, *he may file suit within 30 days of the Commission's final decision.* In any event, the complainant may file a civil action if, after 180 days from filing of the charge or the appeal, the agency or Civil Service Commission has not taken final action.

\* \* \* \* \* \*

The balance, completeness, and structural integrity of § 717(c) are inconsistent with the petitioner's contention that the judicial remedy afforded by § 717(c) was designed merely to supplement other putative judicial relief. His view fails, in our estimation, to accord due weight to the fact that unlike these other supposed remedies, § 717(c) does not contemplate merely judicial relief. Rather, it provides for a careful blend of administrative and judicial enforcement powers. Under the petitioner's theory, by perverse operation of a type of Gresham's law, § 717, with its rigorous administrative exhaustion requirements and time limitations, would be driven out of currency were immediate access to the courts under other, less demanding statutes permissible. The crucial administrative role that each agency together with the Civil Service Commission was given by Congress in the eradication of employment discrimination would be eliminated 'by the simple expedient of putting a different label on [the] pleadings.' *Preiser v. Rodriquez,* 411 U.S. 475, 489–490, 93 S.Ct. 1827, 1836–1837, 36 L.Ed.2d 439 (1973). It would require the suspension of disbelief to ascribe to Congress the design to allow its careful and thorough remedial scheme to be circumvented by artful pleading. (Emphasis added).

■ To the extent that plaintiff's claims herein are that of employment discrimination, the exclusive remedy is Section 717(c) of the Civil Rights Act. From the present record this Court is unable to determine to what extent plaintiff's case has gone through the administrative Equal Employment Opportunity procedures or whether plaintiff has complied with the time requirements stated therein. The fact that plaintiff has filed an administrative complaint establishes that plaintiff does have an alternate forum in which he can seek and receive redress.

Plaintiff has filed a grievance over the matter in the grievance-arbitration machinery of the National Collective Bargaining Agreement. Thus plaintiff has a second administrative forum in which he has sought redress. Plaintiff's union may take his claim all the way to arbitration. In this regard, the Supreme Court has held that when the grievance procedure exists, employees wishing to assert contract grievances must utilize negotiated grievance procedures before resorting to court action. *Republic Steel Corp. v. Maddox,* 379 U.S. 650, 652–3, 85 S.Ct. 614, 616, 13 L.Ed.2d 580 (1965). To the extent that plaintiff's claim is contractual, he must exhaust his remedies in the grievance arbitration procedures before this Court can have jurisdiction.

The plaintiff has failed to establish any basis for a preliminary injunction and the same is now DENIED.