**CHURCH OF GOD (WORLDWIDE, TEXAS REGION) et al., Plaintiffs,**

v.

**AMARILLO INDEPENDENT SCHOOL DISTRICT et al., Defendants.**

Civ. A. No. CA 2–80–35.

United States District Court, N. D. Texas, Amarillo Division.

April 9, 1981.

Michael J. Madigan, Joseph T. Casey, Jr., Akin, Gump, Strauss, Hauer & Feld, Washington, D. C., for plaintiffs.

R. A. Wilson, Underwood, Wilson, Berry, Stein & Johnson, Amarillo, Tex., for defendants.

## MEMORANDUM OPINION

MARY LOU ROBINSON, District Judge.

Plaintiffs are the Worldwide Church of God (Church of God) and twenty-four members of the church who are students of the Amarillo Independent School District. The Plaintiffs by this action under 42 U.S.C. § 1983 and 28 U.S.C. §§ 1331(a) and 1343(3), seek to enjoin the enforcement of the Amarillo School District's absence policy which limits the number of excused absences for religious holidays to two days each school year. The Defendants are the Amarillo Independent School District (school district) and the Superintendent, Deputy Superintendent, and Board of Trustees of the school district. Both the Plaintiffs and Defendants have moved for summary judgment.

### I.

The Church of God is a religious organization with congregations throughout the United States, Canada, and fifty other countries. The church traces its origin to the establishment of the New Testament Church as recorded in Chapter 2 of the Book of Acts in the New Testament. The present era of the church began in 1934, with the establishment of a congregation in Eugene, Oregon, and the broadcast of the Radio Church of God. The church has a current membership of over 68,000. The membership figures do not include children and unbaptized family members who also attend the church.

A fundamental tenet of the Church of God is that members must abstain from secular activity on seven annual holy days. These holy days are founded in the Book of Leviticus in the Old Testament and are fixed in accordance with the Hebrew calendar. Members must also attend a seven-day religious convocation on the Feast of Tabernacles. All holy days except for the seven-day convocation are observed in each local church. The seven-day convocation is observed at regional locations designated by the church. The failure to observe the annual holy days and the seven-day convocation is considered a sin and may result in the loss of membership in the church.

Members of the Church of God who are students miss from eight to ten days of school each year while observing the annual holy days and seven-day convocation. An additional two days of school are sometimes missed in travel to and from the seven-day convocation depending on its date and location. The school district did not set any specific limit on the number of excused absences for religious holidays before March 5, 1979. Instead, principals of the school district were given discretion to determine when an absence would be considered excused. In making the determination the principals were instructed by the school district to consider "to what degree was choice a factor in the absence." Under that policy the Plaintiffs were, for the most part, routinely granted excused absences. The Plaintiffs were also permitted to make up school work missed while observing the holy days and seven-day convocation and to receive a grade for that work.

On March 5, 1979, the school district promulgated a new policy for excused absences and make-up work. The new policy provided:

*Make-Up Work Following Absences*

School work missed may be made up whether an absence is excused or unexcused; however, students readmitted with an unexcused absence will not be given credit for work made up. If a daily or test grade is recorded for the day of absence, the student whose absence is

unexcused receives a zero for a grade. If no grade is recorded for the other students no grade will be recorded for the student who is absent. To obtain credit for work missed when the absence is excused, the student must make up the work. Make-up work should be accomplished within five school days after a student returns from an absence. Exceptions would be made in cases where a student has been absent for an extended period of time due to illness.

*Absences for Religious Holidays*

Excused absences shall be granted to students for a maximum of 2 days for religious holidays in each school year.

The new policy has been strictly enforced since its promulgation. During the 1980–1981 school year the Plaintiffs received only two excused absences for school days missed while observing their holy days and seven-day convocation. The Plaintiffs received zeros for tests and daily work missed on the remaining days of absence.

### II.

The Plaintiffs contend that the school district's excused absence policy is unconstitutional because: (1) it violates the free exercise of their religion as guaranteed by the first and fourteenth amendments to the United States Constitution; (2) it violates the equal protection clause of the fourteenth amendment to the United States Constitution by discriminating against the Plaintiffs on the basis of their religious beliefs, and; (3) it violates the due process clause of the fourteenth amendment to the United States Constitution by creating an irrebuttable presumption that the Plaintiffs are absent without justification.

The Defendants contend that each of these allegations are without merit. They claim that any indirect burden that is imposed on the Plaintiffs' religious beliefs is outweighed by the school district's interest in compelling regular attendance of public school. They further claim that the school district's policy is applied to all religions uniformly, and that if the school district made an exception for the Plaintiff they would be giving recognition to the holy days of the Church of God in violation of the establishment clause of the first amendment.

### III.

█ The first amendment to the Constitution provides that "Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof ..." In *Cantwell v. Connecticut*, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940), the free exercise clause was held applicable to the states through the fourteenth amendment. The Supreme Court has interpreted the free exercise clause to proscribe not only overt discrimination but also practices that are fair in form, but discriminatory in operation. *See, Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972); *Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963); *Braunfeld v. Brown*, 366 U.S. 599, 81 S.Ct. 1144, 6 L.Ed.2d 563 (1961). Thus, "[i]f the purpose or effect of a law is to impede the observance of one or all religions or is to discriminate between religions, that law is unconstitutionally invalid even though the burden may be characterized as being only indirect." *Braunfeld v. Brown, supra* 607, 81 S.Ct. at 1148.

█ The Supreme Court decisions require a two-part balancing test for determining whether a particular governmental action unduly burdens an individual's free exercise of religion. First, a court must decide whether the regulation or law at issue burdens the free exercise of religion. Second, the restriction on the free exercise of religion must be balanced against the importance of the state's interest in the regulation or law. *See, Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972); *Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963). Even if the state's interest appears to be of greater magnitude, the regulation or law will be invalid if the state's interest can be achieved by a less restrictive alternative means.

## IV.

Under this framework for constitutional analysis the Court must first determine whether the belief at issue is a religious belief as opposed to one of a personal or secular character. Although the issue of whether a belief is rooted in religion as opposed to purely secular concerns is a "most delicate question," *Wisconsin v. Yoder, supra* 215, 92 S.Ct. at 1533, it is not one without judicial guidance. In *Brown v. Dade Christian Schools*, 556 F.2d 310 (5th Cir. 1977), Judge Roney of the Fifth Circuit delineated the elements that may and may not be taken into account in determining whether a belief is religious:

> Whether a belief is "religious" and thus deserving of some protection by the First Amendment does not depend on whether the belief is true or false. Nor does it depend on whether the belief is reprehensible to the majority of society. Instead, . . . the "religious" nature of the belief depends on . . . whether the belief is based on a theory "of man's nature or his place in the Universe." . . . which is not merely a personal preference but has an institutional quality about it, and . . . which is sincere. *Id.* at 324 (citations omitted).

 The belief at issue meets the standard set forth by Judge Roney. The Plaintiffs' religious belief is based on a literal interpretation of a biblical injunction. Article 13 of the *Fundamentals of Belief* of the church makes the observance of the holy days and seven-day convocation an absolute duty. Indeed, if not to underscore the sincerity of the Plaintiffs' religious belief, no Plaintiff has attended school on a holy day or day of convocation since the adoption of the school district's policy, notwithstanding the penalty they must suffer to do so.

The Court does not stand alone in this conclusion. The religious character of the Plaintiffs' duty to refrain from secular activities on the holy days and days of convocation has been considered and accepted by other courts. In *Edwards v. School Board of Norton, Va.*, 483 F.Supp. 620 (W.D.Va.

1980), for example, a member of the Church of God brought an action against a school board, contending that her dismissal as a teacher's aide violated Title VII of the Civil Rights Act of 1964. The school board defended the dismissal by questioning whether her religious beliefs, which included observance of the seven-day convocation, were cognizable under Title VII. The Court rejected the defense outright and held that the plaintiff's "religious interpretation that she must refrain from work for an eight day period to attend a religious Feast of Tabernacles is to be considered a bona fide religious practice," and, therefore, protected under Title VII. *Id.* at 625. *See also, Niederhuber v. Camden Cty. Vocational & Technical School District Bd. of Education*, 495 F.Supp. 273 (D.N.J.1980); *Rankin v. Comm. on Prof. Competence of Ducor Union School District*, 24 Cal.3d 167, 154 Cal.Rptr. 907, 593 P.2d 852 (1979).

The Court next considers whether the school district's policy burdens the free exercise of the Plaintiffs' religious belief. The school district's policy limits the number of excused religious holidays to two days in each school year. Although school work missed because of an unexcused absence may be made up, no credit is given for that work. Thus, a student who is absent for religious reasons receives a grade of zero for each daily grade or test grade recorded on the days of absence in excess of the school district's two-day limit.

This policy poses an unquestionable burden on the Plaintiffs' religious belief. Under this policy the Plaintiffs are put to the choice of abandoning a tenet of their religion or suffering a penalty for the class-work missed. This burden is similar to one considered and found unconstitutional by the Supreme Court in *Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963). In *Sherbert*, the South Carolina unemployment commission denied unemployment compensation to a member of the Seventh-Day Adventist Church because she refused to work on Saturday, the Sabbath Day of her faith. After noting that the State's ruling did not involve "criminal

sanction," compelling the church member to work a six-day week, the Court nevertheless ruled that the State's action created a burden on the church member's religious belief:

> Here not only is it apparent that [the church member's] declared ineligibility for benefits derives solely from the practice of her religion, but the pressure upon her to forego that practice is unmistakable. The ruling forces her to choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion in order to accept work, on the other hand. Governmental imposition of such a choice puts the same kind of burden upon the free exercise of religion as would a fine imposed against [the church member] her for Saturday worship. *Id.* at 404, 83 S.Ct. at 1794.

*See also, Niederhuber v. Camden Cty. Vocational Technical School District Bd. of Education,* 495 F.Supp. 273 (D.N.J.1980) (burden found in a Title VII case where plaintiff church member was "compelled to forfeit his position [as a teacher] in order to follow religious convictions.")

The Defendants contend that even if the school district's policy does burden the free exercise of religion, that burden is de minimis. The Defendants advance two arguments in support of that contention. First, they argue that with the exception of the six-week evaluation period in which the seven-day convocation occurs, only two holy days fall on school days. The Defendants reason that any grade of zero recorded during that evaluation period would not significantly alter the over-all average of a student for an academic school year. Second, the Defendants argue that any burden imposed by the school district's policy is ameliorated by the provision of the policy that allows the student to make up the work missed on days of unexcused absences.

The Court disagrees with that analysis. The burden imposed on the Plaintiffs' religious belief is real and substantial. Under the policy the Plaintiffs could conceivably receive a zero for daily work and tests given in each of their classes for as many as eight days during the school year. In *Shanley v. Northeast Independent School District, Bexar Cty., Texas,* 462 F.2d 960 (5th Cir. 1972), the Fifth Circuit stated in a case involving a school disciplinary procedure:

> ". . . the magnitude of a penalty should be gauged by its effect upon the student and not simply meted out by formula. For example, a suspension of one hour could be quite critical to a student if that hour encompassed a final examination that provided for no make-up." *Id.* at 967 n. 4.

The loss of grades in this case not only imposes a substantial impact upon the Plaintiffs' academic record unrelated to their actual level of achievement, but also places a stigma on the students for abiding by their religious belief.

This burden is not ameliorated by the make-up work provision. The provision does not require a teacher to evaluate the work made up. It in fact directs the teacher to enter a zero for that work. Apart from the obvious effect the policy has on the student's academic average, the policy ignores the fact that the evaluation of a student's work is a critical part of the learning process. Moreover, logic tells us that the policy provides no incentive for a student to make up work missed. Only the most disciplined student would make up work knowing that a grade of zero will be entered.

## V.

The Court next considers whether some compelling interest justifies the substantial infringement of the Plaintiffs' first amendment right. The Defendants suggest that two such interests exist. First they claim that regular attendance in public school is necessary for a student's academic development. Second, they contend that accommodating the holy days of various and diverse religious groups would work an unreasonable burden on the teachers.

The Court does not doubt the sincerity of the school district's interest in the academic development of its students. The state's

responsibility for the education of its citizens ranks at the apex of the function of a state. Yet even this paramount responsibility must yield when the application of a law or regulation significantly burdens the free exercise of religion. Thus, in *Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972), the Supreme Court held that Wisconsin could not compel members of the Amish faith to send their children to secondary schools where such attendance was at odds with fundamental tenets of their religious beliefs. The school district's interest in this cause does not approach the magnitude of the state's interest in *Wisconsin v. Yoder*. Here we are not concerned with a religious sect that insists on keeping their children away from school. We are concerned only with the effect of a handful of absences on the Plaintiffs' academic development. This interest, standing alone, does not justify the burden placed on the free exercise of religion.

Moreover, the interest does not become compelling when coupled with the administrative burden of accommodating the Plaintiffs' religious belief. Both the Superintendent and Deputy Superintendent of the school district stated that they had never received a complaint from the teachers concerning their workload under the old excused absence policy. Teachers are routinely required to evaluate the make-up work of students who are absent because of sickness and participation in interscholastic activities such as football, basketball, and band. The Court concludes that requiring the teachers to grade the make-up work of Plaintiffs will not result in an unreasonable administrative burden.

On these facts, the Court holds that the school district's excused absence policy violates the free exercise of religion as guaranteed by the first and fourteenth amendments.

## VI.

Finally, in holding that the school district must accommodate the Plaintiffs' religious belief, the Court does not foster the "establishment" of the Church of God. The Court's holding reflects nothing more than the governmental obligation of neutrality in the face of religious differences, and does not represent that involvement of religious with secular institutions which is the object of the establishment clause to forestall. *See, Sherbert v. Verner*, 374 U.S. 398, 409, 83 S.Ct. 1790, 1796, 10 L.Ed.2d 965 (1962). As stated by the Supreme Court in *Zorach v. Clauson*, 343 U.S. 306, 72 S.Ct. 679, 96 L.Ed. 954 (1952), a case which upheld a New York released time program:

> When the state encourages religious instruction or cooperates with religious authorities by adjusting the schedule of public events to sectarian needs, it follows the best of our traditions. For it then respects the religious nature of our people and accommodates the public service to their spiritual needs. To hold that it may not would be to find in the Constitution a requirement that the government show a callous indifference to religious groups. *Id.* at 312–14, 72 S.Ct. at 683–84.

## VII.

The Court concludes that the school district's policy imposes a real and substantial burden on the Plaintiffs' right to the free exercise of their religion as guaranteed by the first and fourteenth amendments. The Court does not find that the interests advanced by the Defendants in support of the policy justify that burden. The Court further concludes that the school district does not foster the establishment of the Church of God by accommodating the religious belief of the Plaintiffs. Because of the Court's resolution of these issues it is not necessary to decide the Plaintiffs' equal protection and due process arguments.

Accordingly, the Plaintiffs' motion for summary judgment is granted and judgment rendered enjoining the enforcement of the Amarillo Independent School District's excused absence policy insofar as it limits the number of excused absences for religious holidays.

JUDGMENT will be entered accordingly.